State ex rel. Davern v. Rose, 140 Wis. 360.

*By the Court.*—Order affirmed.

STATE EX REL. DAVERN, Respondent, vs. ROSE, Mayor, etc., Appellant.

*September 20—October 5, 1909.*

*Constitutional law: Executive officers: Discretion: Interference by courts: Municipal corporations: Powers of mayor: Suspension of officers: Presumption of good faith: Mandamus.*

1. Courts have no right to interfere with the exercise of the discretion vested in executive officers, state or municipal.
2. No wrong, in the legal sense, results when one receives all that the law accords him; and when the only right of an individual or of the public which the law gives is that which a designated officer deems best, the honest decision of that officer is the measure of the right.

3. Where an absolute duty, involving nothing of judgment or discretion, has been imposed upon an administrative or executive officer, performance thereof may be enforced in a proper case by the courts, if no other adequate method is provided.

4. A city charter declaring that the mayor shall be "the chief executive officer and the head of the fire department and of the police in said city" and that he shall "take care that the laws of the state and the ordinances of the city are duly observed and enforced," confers upon the mayor all of the power of a chief executive, except as elsewhere limited, with the necessary right of discretion and judgment, and does not make him a mere administrative officer.

5. The executive power conferred upon the mayor by such a charter includes the power to appoint and remove subordinate executive officers at discretion, except as qualified by other charter provisions.

6. Where a statute (ch. 378, Laws of 1885) amending a city charter vested the power of appointment and removal of the chiefs of the fire and police departments in a board of commissioners, but provided that either of said officers should be subject to suspension from office for cause by the mayor at any time, and that the mayor should at once communicate to said board the charge or charges against an officer so suspended, for the decision of the board thereon, the suspension might be made for any cause which, in the honest judgment of the mayor, might reasonably render it advisable for the public good.

7. The power and the duty of the mayor as to suspension of officers under such a statute is discretionary in a very high degree. He may weigh all considerations in determining whether he should exercise the power; and his decision not to exercise it, even where there has been gross dereliction on the part of the subordinate officer, is not subject to review or direction by the courts, unless there has been an entire refusal to consider and exercise discretion.

8. The mayor in such a case need not declare the reasons for his decision or his action in deciding against suspension, it being enough for him to declare that he deems the public welfare promoted by action or inaction, and even that declaration need only be by the act.

9. The courts in such a case must indulge in every *prima facie* presumption in favor of the good faith of the executive officer in his discharge of his duties, and only when it is established by the clearest possible evidence that he has wholly refused to exert his jurisdiction or to exercise any discretion whatever can the courts properly interfere by *mandamus*.

10. Where, upon charges being filed against a subordinate officer, the mayor entered into an investigation, taking various means to inform himself of the facts and of the situation, and declared his conclusion that the charges did not warrant suspension, there was an exercise of the discretion vested in him, and *mandamus* will not lie.

APPEAL from an order of the circuit court for Milwaukee county: W. J. TURNER, Circuit Judge. *Reversed.*

*Mandamus.* Relator asserts himself to be a citizen and taxpayer of the city of Milwaukee and that he petitions on behalf of himself and all others similarly situated; asserts various acts of misconduct on the part of the chief engineer of the fire department of said city, and that in September, 1908, he filed with the respondent, then and now mayor of the city of Milwaukee, certain charges of such misconduct; that thereupon said respondent called to his office a large number of the members of the fire department and took their *ex parte* oral statements, and thereupon refused to suspend said chief or to send such charges to the board of fire and police commissioners for investigation, on the ground, as stated by respondent, that said charges were too flimsy to receive serious consideration. The charges consist principally in that some two or three years before said chief temporarily misappropriated certain funds under his official control; that he committed perjury, for which he was indicted, tried, and acquitted in 1907; that at that time he was also guilty of subornation of perjury; that at some times, not named, the labor of certain city employees, and also certain city property, was under said chief's command expended for his private benefit; that he appointed a man upon the fire force because of personal pecuniary obligation to him instead of fitness; that immediately after filing such charges against him he discharged several of the members of the fire department; and other things not deemed material for statement.

The respondent moved to quash the alternative writ issued upon said petition (1) for insufficiency of the matter therein

stated to warrant a writ of *mandamus;* and (2) for defect of parties respondent by reason of the nonjoinder of the chief. The motion to quash was denied, from which action this appeal is brought by respondent.

For the appellant there was a brief by *John T. Kelly,* city attorney, and *Walter H. Bender,* assistant city attorney, of counsel, and oral argument by *Mr. Bender.*

For the respondent there was a brief by *Ryan, Ogden & Bottum,* attorneys, and *Hugh Ryan,* of counsel, and oral argument by *Mr. Ryan.* They contended, *inter alia,* that *mandamus* will lie to compel the mayor to suspend the chief of the fire department and send the charges against him to the board of police and fire commissioners for investigation. *State ex rel. Buchanan v. Kellogg,* 95 Wis. 672; *State ex rel. Starkweather v. Superior,* 90 Wis. 612; *State ex rel. Coffey v. Chittenden,* 112 Wis. 569, 574; *State ex rel. McGovern v. Williams,* 136 Wis. 1; *People ex rel. Empire City T. Club v. State Racing Comm'n,* 190 N. Y. 31, 82 N. E. 723; Merrill, Mandamus, §§ 37–41; *State ex rel. Castor v. Saline Co.* 18 Neb. 422, 25 N. W. 587; *Stockton & V. R. Co. v. Stockton,* 51 Cal. 328, 338; *Raisch v. Board of Ed.* 81 Cal. 542, 546; *Wood v. Strother,* 76 Cal. 545, 546, 548; *Brokaw v. Comm'rs,* 130 Ill. 482, 490, 22 N. E. 596; *Glencoe v. People ex rel. Owen,* 78 Ill. 382, 388, 390; *State ex rel. Brickman v. Wilson,* 123 Ala. 259, 45 L. R. A. 772; *State ex rel. Adamson v. Lafayette County Court,* 41 Mo. 221, 226; *Detroit v. Hosmer,* 79 Mich. 384, 386, 44 N. W. 622; *Ex parte Bradley,* 7 Wall. 364, 377; *Virginia v. Rives,* 100 U. S. 313, 323.

Dodge, J. With a debated question of defect of parties we shall not concern ourselves, since the view we have taken upon the general merits of this case renders it immaterial to the result.

The general plan of the government of the state, either generally or in such sections as its municipal corporations, is

framed upon the theory of intrusting to the legislative and ·executive branches, and administrative officers appointed within them, the formulation of policy and the execution thereof by officials, constitutional or legislative, in whom is vested the discretion as to what will be most promotive of the welfare of the community. ·In general that policy is decided by the legislature, in detail it must in many respects be left to the individual officials acting upon their knowledge of ·specific situations and their judgment as to what the public good requires in those specific instances. Those officers are selected either by the people directly, or by some other method considered likely to procure the persons best qualified in judgment, character, and .ability to perform their respective duties. They take their places as public officers under the sanction of an oath of office and under the burden of a trust as binding and transcendent as do the judges of the courts. Their selection either by the people themselves directly or by their authorized representatives carries with it declaration of the fitness of each officer for his place, conclusive until the appointing authority can have an opportunity to speak again, or until those tribunals vested with authority to remove are invoked. With the exercise of the judgment and discretion committed to such officials the courts have no right to interfere, and this for a very good reason. The occupants of judicial places are not selected to manage the political affairs of the state. The qualifications for their places are vastly different and not such as to imply abilities to that end. Again, their opportunities for acquainting themselves with the needs and wishes of the people of the state or any locality, with all the complex elements involved in a given exigency, are in nowise comparable to those of the legislative or administrative officers. So that, other things being equal, the probabilities of a correct estimate of the needs of the public are far less in case of the judges than they are in case of the holders of the political offices. Of

course, all officials, being human, are liable to err, and the people must suffer the results of errors of judgment into which their responsible officials, judicial as well as others, may fall; but at least the theory of our government is that the peril of error of judgment or intention on the questions committed to them is less in the legislative and executive officials, close to the people and close to the facts of the exigencies in which they act, than it would be at the hands of the judiciary, selected for its supposed ability to apply abstract rules of law to concrete instances.

Thus much has been said because of a growing tendency, of which we think the present proceeding is illustrative, to suppose that any individual who differs with a public official as to the policy which the latter should pursue may demand that the judgment of some court as to his conduct shall be substituted for his own, and control his official acts. Nothing could be further from the theory of our government nor less likely to be promotive of public welfare. *People ex rel. Sutherland v. Governor,* 29 Mich. 320. Courts sit to remedy wrongs, and it is often urged that no wrong should by courts be allowed to go without a remedy; but no wrong in the legal sense results when one receives all that the law accords him. So when the only right of an individual or the public which the law gives is that which a designated officer deems best, the honest decision of that officer is the measure of the right, however his judgment may differ from that of others, even of the courts. *State ex rel. Cook v. Houser,* 122 Wis. 534, 570, 100 N. W. 964; *Rowell v. Smith,* 123 Wis. 510, 528, 102 N. W. 7.

Of course it is true that the legislature may, and very frequently does, impose upon executive and administrative officers absolute duty involving nothing of judgment or discretion except such as is first exercised by the legislature itself, which discretion, being there exercised and pronounced in the law, leaves no choice to the official. Such ministerial

duty may be enforced in a proper case by the courts if there is no other adequate method provided. It therefore becomes essential in every case of official action to consider whether the legislature has so passed upon all questions of policy and discretion and imposed by law a mere ministerial duty in obedience to their decision, or has reposed in the administrative or executive officer discretion as to when or how he ought to act.

In organizing the government of the city of Milwaukee the legislature followed the general lines of the governments of the United States and of the several states in creating legislative and executive departments and officers, mainly independent of each other. The charter provided for a mayor having, within the limited territory, the substantial characteristics of a chief executive in analogy to the President of the United States and the governors of the several states. The charter declared that the mayor should be "the chief executive officer and the head of the fire department and of police in said city," and that he should "take care that the laws of the state and the ordinances of the city are duly observed and enforced." These expressions signify the conferring of all the powers of a chief executive, except as elsewhere limited, with the necessary right of discretion and judgment. They also evince the reliance and confidence in the motives which should actuate the decisions finally arrived at by such an officer which accompany the delegation of broad discretion and responsibility to the other principal officers of government; imposing as an assurance and sanction for the faithful performance of such duties the same official oath as in the case of a governor of a state or the judges of the highest courts. The mayor, therefore, generally speaking, is in no sense a mere ministerial officer to perform only acts as to which the legislature has exercised all discretion and judgment and made him a mere implement of expression. While, as already said, mere ministerial duties may incidentally be

conferred upon him, the general words of the charter go much further. They indicate reliance in his discretion rather than mere ministerialism.

From early times the grant of executive power, the general power to execute the laws, has been construed as broadly effective of itself, and especially so in the matter of appointment and removal of subordinate officers. On this subject occurred the most famous historical instance of constitutional construction by a legislative body. In the first Congress of the United States, upon a bill to create the Secretary of Foreign Affairs, to be appointed by the President with the consent and approval of the Senate and "to be removed from office by the President of the United States," ensued in the House of Representatives one of the most remarkable debates in the history of the federal government, on the question whether the last-quoted words should be eliminated because implying assertion of power in the Congress to grant or withhold the right of removal; it being contended, on the one hand, that the power under the constitution might rest in any of several places, and, on the other hand, under the leadership of James Madison, that the "executive power" conferred by the constitution on the President had already vested in him the power of removal of executive officers, and that the Congress could not take it away and should not appear to claim such right. Those debates are contained in 1 Annals of Congress, extending from page 455 to page 585, and resulted in the overwhelming adoption of Mr. Madison's contention against the proposition that the power of removal inhered in or resulted from the power of appointment or rested with the legislature to grant or withhold, but that it was included in the "executive power," and hence was vested in the President. That construction of the constitution has received multitudinous approval since, and been recognized by all thoughtful and careful writers, jurists, and attorneys-general of the United States as settled.

2 Marshall, Life of Washington, 162; 1 Kent, Comm. 310; Bancroft, History of the Constitution; *Ex parte Hennen,* 13 Pet. 225; 4 Op. Att'y Gen. (Legare) 1; Id. (Clifford) 603, 609; 5 Op. Att'y Gen. (Crittenden) 288, 290. This subject was exhaustively discussed and a very complete collection of the expressions of leading writers thereon embodied in the brief for the government in *Parsons v. U. S.* 167 U. S. 324, 17 Sup. Ct. 880. Mr. Madison's views, thus adopted, are expressed more particularly on pages 462, 463, 464, and 499 of 1 Annals of Congress. Thus, before adoption of our constitution and before the draft of the Milwaukee charter, it had become established that executive power as conferred by such instruments included the power to appoint and remove subordinate executive officers at discretion, except as qualified by other expressions.

Hence, seemingly, it would be plain that in the absence of any other charter provisions the mayor, merely by his creation as the chief executive, and by the imposition of the duty to see that the laws and ordinances were enforced, would have the power of appointment and removal. That power, however, was qualified in some degree through all stages of the charter of Milwaukee up to the adoption of a fire and police commission by ch. 378, Laws of 1885, whereby the appointment and removal of the chiefs of the fire and police departments was vested in that board and taken away from the mayor. Sec. 6 of that act provides that in case of a vacancy in either office it shall be the duty of said board to appoint proper persons to fill such offices "during good behavior, subject to suspension and removal as hereinafter provided;" and sec. 12 conferred on the board the power to remove either such officer when of the unanimous opinion that the good of the service would be subserved thereby. These provisions, emanating from the legislature, were of course limitations upon the executive power of the mayor, but accompanying them was sec. 11 of the same act, which provided that the

chief of police and the chief of the fire department and other specified officers shall be subject to suspension from office for cause by the mayor at any time. Any officer so suspended shall thereupon cease to exercise the functions of his office until he shall be reinstated. In case of such suspension the mayor shall at once communicate to said board the charge or charges against the officer suspended, and the board shall at once consider and examine the same, giving the suspended officer opportunity to meet the charges and to be heard in his own defense. If the charges are not sustained by the board the officer shall be immediately reinstated. If they are sustained the board shall determine whether the good of the service requires removal from office or suspension, and their decision shall control the action of the mayor.

It is clear that thus was formulated an entirely new scheme or plan with reference to certain subordinate executive officers, whereby the whole subject of their appointment and removal was taken out of the hands of the chief executive of the city and vested in a board; but it is equally apparent that the legislature, appreciating the inherent incapacity of such boards for prompt and effective executive action in emergencies, intended to preserve in the mayor the power of suspension in a proper case. That power was lodged in the mayor as essential to his duty to guard the general welfare and to see that the laws and ordinances should be enforced. The cause mentioned in sec. 11 for which the suspension might be made, of course means any cause which in the honest judgment of the mayor as a trusted and responsible chief executive might reasonably render such suspension advisable for the public good. The discretion so conferred empowered him to weigh all considerations in deciding whether sufficient cause existed for such suspension. Those causes and considerations are innumerable. A perfectly good cause for removal may be no sufficient cause for summary suspension, and, vice versa, a good cause for temporary sus-

pension may exist which does not warrant complete removal. In the case of the fire chief his abilities as a fighter of fire to preserve property and the safety of the community are considerations of great importance which may well deter the mayor in his honest judgment from even temporarily displacing him and leaving the city without his services, although he may lack many other attributes of an ideal public officer, and thus make choice of a successor advisable. The condition of things as to the presence upon the force of a subordinate able to supply those emergency qualities which the chief may have might well justify the mayor in deciding not to suspend one whom he may believe ought not permanently to continue as the chief of that fire department because of other defects of character during consideration by the board of the sufficiency of those defects as cause of removal. For multitudinous reasons like these, it is not the absolute duty of the mayor, even if informed of great or even gross dereliction in certain directions, to momentarily deprive the city of the protection resulting from other abilities of such an officer as the fire chief or the chief of police.

The contention of respondent to the effect that whenever charges are laid by a "citizen and taxpayer" a ministerial duty is imposed upon the mayor to forthwith suspend, at once suggests illustrations which are convincing of the impossibility of such legislative intention. Were the chief of police engaged in a campaign against gambling houses or houses of ill-fame, he would naturally draw upon himself the antagonism of those who profit from such establishments, and if, at the critical moment of such proceeding, a fearless and effective chief of police must lay down the fight because the proprietor of such a building, a "citizen and taxpayer," laid some charge of general impropriety or even dishonesty against him, the possibility of the enforcement of the laws and ordinances for the time being at least might well disappear. The mayor must be authorized in such a case to look

not alone to the charges, but as well to the necessities of the
community.   The possibility of a substitute for the assailed
officer competent to meet the exigencies of the moment and
an infinity of other considerations as to whether it is best
that he be summarily suspended and the office left vacant
until the commission can, in the slow course of investigation
and procedure that must characterize such bodies, fill the
place with another appointee, present themselves in such a
contingency.   We are persuaded that the power, and of
course the duty, of suspension preserved in the mayor by
sec. 11 is discretionary in a very high degree, and therefore,
under the uniform holding of this court, that the mayor's de-
cision not to exercise it is not subject to review or direction
by the courts, unless indeed there may be found an entire re-
fusal to consider and exercise discretion.   *State ex rel. Gill
v. Common Council,* 9 Wis. 254; *State ex rel. Gericke v.
Mayor, etc.* 99 Wis. 322, 326, 74 N. W. 783; *State ex rel.
Coffey v. Chittenden,* 112 Wis. 569, 574, 88 N. W. 587;
*State ex rel. People's L. & Mfg. Co. v. Holt,* 132 Wis. 131,
111 N. W. 1106; *State ex rel. Wis. Met. Tel. Co. v. Mil-
waukee,* 132 Wis. 615, 618, 113 N. W. 40; *State ex rel.
Rudolph v. Hutchinson,* 134 Wis. 283, 114 N. W. 453; *State
ex rel. Vanderwall v. Mayor, etc.* 134 Wis. 437, 114 N. W.
802; *State ex rel. Wagner v. Dahl, ante,* p. 301, 122 N. W.
748; High, Extr. Leg. Rem. § 42.

In this case we can find nothing of such refusal.   There
is no duty resting upon an executive officer vested with such
ample discretion as this to declare the reasons for his decision
or his action in deciding against suspension.   It is enough
for him to declare that he deems the public welfare pro-
moted by action or inaction, which declaration indeed need
only be by the act.   John Adams, who, as Vice-President, had
cast the deciding vote in favor of Madison's construction
of executive power, referred to in an earlier part of this
opinion, gave his own illustration, when President, of the

State ex rel. Davern v. Rose, 140 Wis. 360.

extent of accountability of the chief executive under such a power in his communication of May 12, 1800, to the then secretary of state, which reads:

"Divers causes and considerations essential to the administration of the government in my judgment requiring a change in the department of state, you are hereby discharged from any further service as secretary of state. John Adams, President of the United States."

In the presence of such a solemn declaration courts must indulge in every *prima facie* presumption in favor of the good faith of the executive officer in his discharge of his duties as such, and only when it can be established by the clearest possible evidence that such officer has wholly refused to exert his jurisdiction or to exercise any discretion whatever can the courts properly interfere by *mandamus*. *Spalding v. Vilas,* 161 U. S. 483, 16 Sup. Ct. 631; *People ex rel. Peabody v. Att'y Gen.* 22 Barb. 114, 118; *Ely v. Cram,* 17 Wis. 537; *Connor v. Marshfield,* 128 Wis. 280, 288, 107 N. W. 639.

In the present case it appears by the relation itself that upon receipt of relator's so-called charges the mayor did enter into an investigation, took various means to inform himself of facts and of the situation, and declared his conclusion that the charges did not warrant the suspension of the officer, resulting as it must to the latter's great detriment and to the deprivation of the city and the public of his services. It is apparent, therefore, on the face of the papers that the discretion was exercised, and that the conditions upon which it might be the duty of the mayor to suspend the fire chief did not exist. Hence, of course, the motion to quash should have been granted.

*By the Court.*—Order reversed, and cause remanded with directions to quash the alternative writ of *mandamus* and to dismiss the proceeding.