94 P.2d 515

**BOARD OF COM'RS OF GUADALUPE COUNTY v. STATE et al.**

**No. 4480.**

Supreme Court of New Mexico.

June 19, 1939.

Rehearing Denied Oct. 20, 1939.

Filo M. Sedillo, Atty. Gen., Fred J. Federici, Asst. Atty. Gen., and Richard E. Manson, of Santa Fe, for appellants.

Joseph T. Cole, Jr., of Santa Rosa, and M. E. Noble, of Las Vegas, for appellee.

BICKLEY, Chief Justice.

A petition was presented to appellee to call a bond election to submit to the qualified electors of Guadalupe County the question of whether or not bonds shall be issued in the sum of $35,000, "the proceeds of which shall be used for the purpose of *remodeling* the County Court House of Guadalupe County and *building an addition thereto.*" (Emphasis ours.)

Pursuant to such petition an election was called and held, the question submitted

being in conformity with the petition. The election resulted in approval of the issue.

The State, through its Treasurer, in response to a request made a bid for the bonds, subject to the approving opinion of the Attorney General or of an attorney of the selection of the State Treasurer. This bid was accepted. Thereupon, appellee by resolution proceeded to authorize the issuance of the bonds. Appellants, acting under advice of counsel, declined to complete the purchase of the bonds because as they construed Article IX, Sec. 10, of the Constitution, the county had no authority to issue bonds for the purpose of remodeling the court house and building an addition thereto but had authority only to issue bonds for the purpose of "building a court house." This resulted in the filing of a complaint by appellee seeking a declaratory judgment alleging facts substantially as above set out. A demurrer was interposed by appellants questioning the sufficiency of the allegation therein to constitute a cause of action. The demurrer was overruled and this appeal was taken from the judgment of the court rendered upon the pleadings in said cause upon appellants' refusal to answer or plead further.

The sole question presented is whether or not under the provisions of Article IX, Sec. 10, of the Constitution and controlling statutes counties can issue bonds for the purpose of remodeling a court house.

■ It is axiomatic that counties have no inherent power to borrow money or issue bonds and can only do so pursuant to authority granted by statute or by the Constitution.

■ We do not find that with us counties derive power to issue bonds from the Constitution. Article IX, Section 10, of the Constitution of New Mexico is a limitation upon and not a grant of power. Said section is as follows: "No county shall borrow money except for the purpose of erecting necessary public buildings or constructing or repairing public roads and bridges, and in such cases only after the proposition to create such debt shall have been submitted to the qualified electors of the county who paid a property tax therein during the preceding year and approved by a majority of those voting thereon. No bonds issued for such purpose shall run for more than fifty years."

■ Counties derive power to issue bonds "for the purpose of building court houses, jails and bridges" from § 33-3901, N. M. S. A.1929 Comp. (enacted 1891).

It is not controverted that "erecting" a court house and "building" a court house mean the same thing. The terms "erecting" and "building" are of such similarity of meaning that it may be said that they *invariably* mean the same thing. As a starting point it may be said that in the submission of questions as to the issuance of bonds, the use of words which necessarily and invariably are of the same import as words employed in the grant of power or in the limitations on the power will not invalidate the issue although it is not apparent why those who have in charge

such matters choose to use synonyms when the words of the statute granting the power are available and preferable.

We assume that had the question submitted been limited to "building an addition" to the existing court house, which in common parlance contemplates a new building or structure, the present controversy would not have arisen.

The question is: Does the phrase "for the purpose of remodeling the county court house" included in the proposition submitted invalidate the issue?

In considering this question a glance at legislative enactments existing at the time of the adoption of the Constitution and other enactments will be helpful.

It appears from an examination of §§ 33-5601, through § 33-5608, N.M.S.A.1929 Comp., that Boards of County Commissioners have power to levy a tax annually for the purpose of creating a fund with which "to provide a court house", such fund to be designated "court house building fund." That power was supplemented by the authority to anticipate the levy for any one year by borrowing money, against the amount of the levies provided for in the statute. See § 33-5604, N.M.S.A.1929 Comp. They are also authorized to cause to be levied a tax for the purpose of making needed repairs on county court houses and county jails. The product of such levies shall be kept separate and apart in the fund to be known as the "court house repair fund" and not used for any other purpose. As to such power, the legislature did not see fit to add the power to borrow money by anticipating the collection of tax levies.

Attention is also directed to our statute establishing a lien on behalf of mechanics and materialmen. Sec. 82-202, N.M.S.A. 1929 Comp., provides that: "Every person performing labor upon, or furnishing materials to be used in the *construction, alteration or repair* of any * * * building * * * has a lien upon the same," etc. (Italics ours.) This statute was enacted in 1880 and is unchanged. It is apparent that the lawmakers understood that construction, alteration and repair are words having a different signification. If *invariably* "construction" includes alterations and repairs, all three words would not have been employed.

In 3 Words & Phrases, First Series, p. 2453, under the word "erect" we find the following:

"Where the structure of a building is so completely changed that in common parlance it may be properly called a new building or a rebuilding, the process of change is such an erection or construction of a building as to be within the meaning of that phrase as used in laws giving mechanics' liens. Smith v. Nelson (Pa.) 2 Phila. 113, 114."

" 'Erected,' as used in a mechanic's lien law, giving a mechanic's lien on every building erected by mechanics, is not used strictly, and applied to the erection of new buildings, but includes, as well, a structure which was so completely changed in re-

pairing that in common parlance it may be properly called a 'new building' or a 're-building.' Thus, where every part of· an old building is removed, except the back wall and part of the side walls, and the openings in them are changed, and the whole internal structure and external form of the building are changed, both as to its length and height, such a building is erect-ed, within the meaning of the law. Arm-strong v. Ware, 20 Pa. (8 Harris) 519, 520."

"Every change, alteration, or addition in or to an existing structure does not con-stitute an 'erection or construction of a building,' within the meaning of that phrase as used in laws giving mechanics' liens. The change or alteration must be such that the whole structure, as changed or altered, would commonly be regarded as another new and different building;' and the addi-tion of a back building to a main structure —as, for instance, a bathhouse and kitchen to a residence—is not an erection or con-struction of a building. Rand v. Mann (Pa.) 3 Phila. 429."

It must be presumed that when the Con-stitution makers wrote the Constitution and considered the power of counties with re-spect to taxation and the power to borrow money and in writing the limitations on the power to borrow money, they were aware of the power the counties theretofore had to borrow money "for the purpose of build-ing court houses, jails and bridges" be-cause in Article IX, Section 10, they limit-ed the power to "erecting necessary public buildings" but left it open to the legislature to extend the power to include the borrow-ing of money to "repairing public roads and bridges." May we say that the constitu-tion makers, while thus discriminating in the use of words, contemplated that in lim-iting the borrowing power to securing funds for the purpose of "erecting neces-sary public buildings" the authorities could also without offending the Constitution bor-row money to repair or remodel or make similar improvements in public buildings? Undoubtedly the *repair* of a building may involve remodeling of it. Frequently the terms repair and remodel are used inter-changeably. But we assume that "remodel" is a word of larger signification than "re-pair." We quote from appellee's brief defi-nitions of "remodel" there assembled:

"The Universal Dictionary of the Eng-lish Language, in defining 'remodel' says:

" 'Remodel—To model, shape, form, fashion, afresh, to recast.'

"Websters New International Dictionary, Second Edition, Unabridged, 1938, Edition, in defining 'remodel' says:

" 'Remodel—To model anew; to recon-struct.'

"Corpus Juris, in defining 'remodel', 54 C.J. 108, says:

" 'Remodel—A word of broad meaning. Among other definitions it means to re-form, reshape; reconstruct; to make over in a somewhat different way.

" 'Remodeling of a building is more than repairing it or making minor changes

therein. The ordinary significance of the term imports a change in the remodeled building practically equivalent to a new one.'

"Websters Collegiate Dictionary, Fifty Edition, in defining 'remodel' says:

" 'Remodel—To model anew; to reconstruct.' "

In the common understanding of the people, when we speak of the building of a house we mean the erection or construction of a new house and not the repair or remodeling of an old one. See Landis' Appeal, 10 Pa. 379. And yet it may be conceded that a building may be so greatly changed in structure, in the materials which enter into it, and in its internal arrangements, without at all losing its identity or ceasing to be the same building, and nevertheless be so entirely changed in plan, in structure, in dimensions, and in general appearance as to become, in a fair sense, and according to the common understanding of men, another building, a new building. On the other hand, it is everyday experience that buildings are remodeled more or less extensively and upon a contemplation of the changes, re-formation, reshaping or recasting there would not be, according to the common understanding of men, the creation of another building, a new building. The Attorney General concedes that under certain circumstances an existing building may be so altered, recast or remodeled that the result will in common understanding be the erection of a new building. However, he claims that this does not aid the appellee. He argues quite persuasively:

"Unless the question as submitted to the voters falls squarely within the provisions of the constitutional provision, notice to the electors will be misleading and the whole proceedings void. Mann v. City of Artesia, 42 N.M. 224, 76 P.2d 941. According to the facts as submitted in this case, there is no way the electors could determine the extent of the remodeling to be done. In other words, some may have been willing to incur an indebtedness of Thirty-five Thousand Dollars ($35,000.00) if the addition to the courthouse, as set out in the election notice, would consume a substantial part of the proceeds and only a small amount of remodeling and decorating could be done. Or, on the other hand, they might have been willing to vote for the issue if most of the old building was to be demolished and the remodeling and improvement extensive. However, there is no way for this Court or anyone else to tell what the voters intended when they voted upon this question.

"We cannot speculate as to how appellees would have used the proceeds. An entirely different question would be presented if after the election and sale of bonds a suit was brought to enjoin the expenditure of money upon the grounds that it was being diverted for purposes not authorized in the bond election. In other words, if the election had been to incur indebtedness for the purpose of erecting a courthouse instead of remodeling the same, and the

Commissioners had proceeded to use part of the old building, this Court could properly in a suit to enjoin such issue inquire into the factual question as to whether or not the remodeling was so extensive as to include the term 'erecting'. But this is not the case. Therefore, if the issue is to be sustained at all, it must be sustained upon the theory that the word 'erecting' as used in the constitutional provision is either synonymous with or necessarily includes by implication the term 'remodel.' "

We think the thought presented in the paragraph last quoted should be further amplified. Section 9, Article IX of the Constitution provides: "Any money borrowed by the state, or any county, district, or municipality thereof, shall be applied to the purpose for which it was obtained, or to repay such loan, and to no other purpose whatever."

We are not in the case at bar concerned with the application of this section of the Constitution last above quoted. We can understand that if the question were here presented that the money borrowed by the county was being applied to a purpose other than that for which it was obtained, facts might be presented which would establish that an existing building was being so completely changed or remodeled that in common parlance it might be properly called a newly erected building. In other words, the matter must be viewed from different positions and at different times, thus:

(a) From the standpoint of the taxpayer when he votes on the question and what he has before him to enable him to cast an intelligent ballot; and

(b) From the standpoint of the taxpayer who is seeing the money which has been obtained at the bond election expended. At that time the taxpayer will have concrete information as to what is being done with the money and the facts in the particular case may demonstrate that the money obtained for the purpose of erecting a building is in fact being diverted to other purposes, for instance, to the remodeling, which falls short of even the most favorable definitions which in some instances as above pointed out will bring remodeling within the scope of erection of a building.

In support of his contention on behalf of appellants, the Attorney General cites State ex rel. King v. Lothrop, 55 Nev. 405, 36 P.2d 355, and says:

"In that case an earthquake severely damaged the courthouse in Lyon County, Nevada. The Board of County Commissioners attempted to issue bonds for the purpose of repairing and remodeling their courthouse. The pertinent Nevada statute provided that counties could issue bonds to build or purchase courthouses. It was there held that such authorization did not include the power to remodel or repair. The Court in passing upon the question said:

" 'The two following sections provide for the issuance of bonds and the method of retiring the same. It will be seen that these sections do not contemplate the issuance of bonds for the repairing or remodeling buildings for county purposes. They empower the commissioners of a county, when it is not supplied with suitable buildings for its purposes, to issue bonds in order to *build* or *purchase* the same. Whatever may have been the extent. of the damage caused Lyon County Courthouse by the earthquake rendering it unsuitable for county purposes (and it appears from the petition that the damage is considerable), it is ·clear therefrom that the commissioners do not intend to build or purchase a building. It is proposed only to repair or remodel the present building and make an addition thereto. It is well settled that county commissioners have only such powers as are expressly granted, or as may be necessarily incidental for the purpose of carrying such powers into effect. Sadler v. Board of Com'rs of Eureka County, 15 Nev. 39.'

"Another case which is similar to the case at bar and which is persuasive is City of Mayville v. Rosing, 19 N.D. 98, 123 N.W. 393, 26 L.R.A.,N.S., 120. In that case the city ordinance of Mayville, North Dakota, prohibited the construction of any wooden building within the fire limits of the city. It was there held that the repairing and *remodeling* of the wooden building did not violate this ordinance.

"Another case that is persuasive is Vollor v. Board of Supervisors of Warren County, 156 Miss. 625, 126 So. 390. In that case a county by election authorized a bond issue for the purpose of remodeling, repairing, enlarging and supplementing its courthouse. After the election returns they decided to erect another building. It was there held that the Commissioners had no authority to do so because the question as submitted to the voters did not include the building of a separate and distinct building."

It is not that it is less essential that public buildings be repaired or that they be improved, by ·making alterations therein, but as we have seen the course of legislation indicates that repairs should be paid for out of current taxation; and doubtless ordinary alterations or remodeling are to be paid for in the same way.

An illustration of a constitutional limitation with reference to bond issues which is unlike ours may be found in the Louisiana Constitution from which we quote in abbreviated form the better to bring out the point: "No bonds to be issued for any purpose other than that stated in propositions submitted to taxpayers nor for a greater amount than therein stated, nor shall such bonds be issued for any purpose other than 'constructing, improving and maintaining * * * public parks and buildings together with all necessary equipment and furnishings, etc.' " Our Constitution makers saw fit to leave out the words "improving and maintaining."

These various citations demonstrate the necessity of including the various distinct

phases of work on buildings if they are to be excluded from the limitation. The absence of the word "remodel" from Section 10, Article IX of the Constitution, and from the statute, which is the source of the county's power or authority to borrow money is significant.

The members of the Constitutional Convention and the people who adopted the Constitution must be credited with an understanding that in common parlance the erection of a building and the alteration or remodeling of the buildings already existing are distinct and different things. The remodeling of a building, like the repair of it, which in many instances embraces some remodeling, is frequently highly important and desirable but that does not mean that the county authorities must issue bonds and borrow money or leave the remodeling and repairs undone. Current taxes will doubtless suffice for these lesser improvements. The court has no power by construction to enlarge the scope of constitutional provisions beyond their intent even to correct situations which the courts may believe should be remedied. See La Follette v. Albuquerque Gas & Electric Co.'s Rates, 37 N.M. 57, 17 P.2d 944.

In construing a constitutional provision expression of one thing is exclusion of another. See In re Atchison, Topeka & Santa Fe Railway Co., 37 N.M. 194, 20 P.2d 918.

The expression of the limitation on power to borrow money for the purpose of *erecting* buildings excludes the power to borrow money to remodel, alter or repair a building already existing, unless these processes amount in fact to erection of a building.

Unless we can say that *invariably* "remodeling" is included within the meaning of "erecting" and "building", we would be doing violence to the language of the limitation and of the power to borrow money, respectively, by enlarging the meaning of the words "erecting" and "building" so as to embrace all "remodeling."

In Harrington v. Hopkins, 288 Mo. 1, 231 S.W. 263, the Missouri Supreme Court in Banc unanimously held that: "Const. art. 10, § 11, limiting the annual tax rate, by providing that the limit may be exceeded for the erection of buildings, does not authorize an excess in the rate limit for repairing and furnishing buildings."

If the question submitted to the electors called for their approval or disapproval, for or against the creation of a debt for the erection of public buildings, and the electors approved the creation of the debt *for that purpose,* the question would have been submitted in accordance with the power granted in the statute and not in violation of the limitation contained in Section 10 of Article IX of the Constitution.

The power and the limitation are couched in general language easily understood. Constitutions deal with matters "generally" and in general terms and do not refer to specific cases.

If the creation of the debt was authorized by the electors and the money obtained, a law suit might arise as to whether the county was applying the money for the purpose for which it was obtained. As we have said, sometimes but not always "remodeling" might be of such a nature as to change the identity of a building so that in common parlance it could be properly said that a new building had been erected. This would be rare, yet good faith and the facts of the *particular case* might enable the county to successfully resist an injunction against an alleged violation of Section 9 of Article IX of the Constitution inveighing against the misapplication of the proceeds of a bond issue.

We doubt if a showing could be made strong enough to demonstrate that the electors had in mind a correct picture of what was intended to be done. No facts are stated in the *submission* from which the *unusual* can be gathered or assumed. Here we have no allegations of fact to inform us that the extent of the remodeling would be to change the identity of the existing building so that it could be said in common parlance that a new building is being erected.

A possible different situation might exist when the money was being expended. The taxpayer could see what was being done. The voter at the bond election from the question submitted has no guide except an appraisal of the meaning of the words employed as those words are commonly understood. The vice of the manner in which the proposition was submitted in the instant case is apparent when we consider that electors may have been induced to vote for the bonds on the theory that such procedure would saddle upon taxpayers the burden of paying for "remodeling" an existing building which the constitution makers by Section 10, Article IX and the legislature evidently intended should be paid for out of current taxation. See Grabe v. Lamro Independent Consol. School District No. 20, 53 S.D. 579, 221 N.W. 697, 698.

In that case it was decided that where the ballot used in the election indicated that school bonds were to be issued for the purpose of purchasing a site and erecting and equipping a school house, the proposition was not legally submitted in view of the fact that the school district had no authority to issue bonds to provide funds to *equip* school buildings. The court said: "It is also well established that the submission of a proposition to bond for a purpose for which the issuance is empowered in conjunction with a purpose for which the issuance is not authorized does not legalize the issuance for either purpose."

We are in sympathy with the aspirations of the county authorities and the electors who desire to improve the county courthouse but we cannot depart from what we think to be the law of the case however pressing the emergency may be.

From all of the foregoing it appears that the judgment of the district court must be

reversed and the cause remanded with directions to sustain the demurrer, and it is so ordered.

ZINN, SADLER, and MABRY, JJ., concur.

BRICE, Justice (dissenting).

The theory of the majority is that the petition of electors, the resolution or order calling an election and the notice of election, should each state in the words of the Constitution that the purpose is to *erect* a court house; or, if not in the exact words, then words that *"invariably* mean the same thing." That would be the safest course for boards of county commissioners and other like bodies to follow; but the membership of those boards is composed of average citizens, not learned in the law as are my brethren of the bench. Such precision in the use of words as that a synonym substituted for a key word in the Constitution must precisely and invariably in all its uses, have the identical meaning of such key word, should not be required of them. Too often the effect would be that their county would suffer a waste of labor, time and money by being forced to commence proceedings anew, not to mention the expense of court proceedings to determine whether they had erred in the use of a word.

In State ex rel. Rose v. Job, 205 Mo. 1, 103 S.W. 493, 502, the Supreme Court of Missouri stated regarding the membership of school boards: "* * * It is but common knowledge that matters pertaining to the interests of the public schools in nearly all the districts of this state rest with plain, honest, worthy citizens not specially learned in the law, and, if we are to look at all times for a strict and technical compliance with the statute, then we confess that numerous districts in this commonwealth would fail of their purpose, for the reason their organizations did not meet with such strict and technical requirements."

This statement could well be applied to the average board of county commissioners of this state. To require such precision in the use of language is not to the best interest of the people who have to foot the bill, and is opposed to the liberality with which constitutions should be construed.

We stated in State ex rel. Ward v. Romero, 17 N.M. 88, 125 P. 617, 621:

"It is the duty of this court to interpret the various provisions of the Constitution to carry out the spirit of that instrument. We should not permit legal technicalities and subtle niceties to control and thereby destroy what the framers of the Constitution intended.

"Where the spirit and intent of the instrument can be clearly ascertained, effect should be given to it, and the strict letter should not control if the letter leads to incongruous results clearly not intended."

This is in harmony with the rules for construing constitutions as laid down by the Supreme Court of the United States, and courts of other states.

"The words 'concurrent power' occur in an amendment to a Constitution. In framing such instruments words naturally are employed in a comprehensive sense as expressive of general ideas rather than of finer shades of thought or of narrow distinctions. The simple and dignified diction of a Constitution does not readily lend itself to technical definition. There the terse statement of governmental principles in plain language may be looked for." Com. v. Nickerson, 236 Mass. 281, 128 N.E. 273, 279, 10 A.L.R. 1568.

"A constitution, establishing a frame of government, declaring fundamental principles, and creating a national sovereignty and intended to endure for ages, and to be adapted to the various crises of human affairs, is not to be interpreted with the strictness of a private contract. The constitution of the United States, by apt words of designation or general description, marks the outlines of the powers granted to the national legislature; but it does not undertake, with the precision and detail of a code of laws, to enumerate the subdivisions of those powers, or to specify all the means by which they may be carried into execution." Juilliard v. Greenman, 110 U.S. 421, 4 S.Ct. 122, 125, 28 L.Ed. 204.

"An act of the General Assembly should not be set aside by implication. A constitution should not receive a technical construction, as if it were an ordinary instrument or statute. It should be interpreted so as to carry out the general principles of the government and not defeat them." Jenkins v. State Bd. of Elections, 180 N.C. 169, 104 S.E. 346, 349, 14 A.L.R. 1247.

"The interpretation of constitutional principles must not be too literal. We must remember that the machinery of government would not work if it were not allowed a little play in its joints." Bain Peanut Co. v. Pinson, 282 U.S. 499, 51 S. Ct. 228, 229, 75 L.Ed. 482.

Now, taking up the definitions of "remodel" as quoted in the majority opinion, we find that each authority defines it in substance "to model - anew; to reconstruct." The citation from Corpus Juris is:

" 'Remodel—A word of broad meaning. Among other definitions it means to reform, reshape; reconstruct; to make over in a somewhat different way.

" 'Remodeling of a building is more than repairing it or making minor changes therein. *The ordinary significance of the term imports a change in the remodeled building practically equivalent to a new one.'* "

I can hardly conceive of a building being remodeled without making a different building of it. The majority, however, in opposition to the definitions they have quoted, take the view that one of the ordinary meanings of the word is to make minor changes. I do not think this is tenable; but it is not material. We can assume that one can remodel a building

without in effect making it a new one; yet if in truth one of the ordinary meanings of the word is *"to reconstruct"* so that in fact such reconstructed building will in effect be a new one, this, according to the majority opinion, is "to erect a court house," within the meaning of the Constitution.

But it is asserted by the majority that the notice did not advise the extent of the improvement so the electorate could intelligently vote on the question. If the notice had advised, in the words of the Constitution, that the purpose was *to erect* a court house, the information given the electorate would not have been nearly so enlightening.

If we are to assume that interested electors will rely on the published notice alone for information, then a notice in the words of the Constitution that the purpose is to erect a court house, would be more likely to mislead, and less likely to secure an informed expression of the electors on the question, than the notice given to the electorate of Guadalupe County.

But it may be assumed that, upon reading such notice, the interested electors will inform themselves generally regarding the details so that they can intelligently vote upon the question. The location, plans and character of the improvement, all would necessarily be subjects of inquiry to secure information for intelligent voting. Ordinarily, if an elector is not interested enough to make inquiries, he is not interested enough to vote. I have no doubt but that the interested electors of Guadalupe County, who voted on the question, were fully informed regarding the proposed use of the proceeds of the bond issue.

The majority opinion cites no authority in support of the theory of strict construction, or any case with supporting facts. It cites State ex rel. King v. Lothrop, 55 Nev. 405, 36 P.2d 355, 357. The statute of Nevada authorized the issuance of bonds "to build or purchase" a court house. The resolution of the county board provided for the issuance of $25,000 of bonds to "repair and reconstruct" the present court house. The court said: "The power to repair a courthouse or other public building is expressly given to boards of county commissioners by paragraph 11, § 1942 N.C.L., but the power to issue bonds for such purpose is not conferred by that section." But the Nevada court was informed regarding the extent of the proposed improvements and concluded that the funds were to be used to "repair the court house," saying: "The power to repair a court house * * is expressly given to boards, but the power to issue bonds for such purpose is not conferred." I understand that bonds cannot be issued for such purpose in New Mexico, but that is not the question here.

In Cotter v. Joint School Dist., 164 Wis. 13, 158 N.W. 80, 81, it was held generally that resolutions of school districts and other minor deliberative bodies should receive a liberal construction to effectuate their evident intent and in disposing of

an almost identical question, the Wisconsin court said: "It is urged that, since the statute permits a loan only for the purpose of aiding in the erection or purchase of a schoolhouse, money cannot be borrowed for the purpose of remodeling a schoolhouse and building an addition thereto; that the remodeling of a building is not equivalent to an erection thereof. We think such a construction is too narrow. The statute was intended to enable school districts that did not have adequate schoolhouses to obtain them by purchase or erection, and it should receive a liberal construction to effectuate that purpose. The remodeling of a building is more than repairing it or making minor changes therein. The ordinary significance of the term imports a change in the remodeled building practically equivalent to a new one. When it is supplemented by the building of an addition thereto, the whole operation may properly be held to come within the purview of the statute."

This is my view of the meaning of "remodel," but certainly it is one of the ordinary meanings of the word. The Cotter Case was cited with approval by the Supreme Court of Missouri in Beauchamp v. Consolidated School Dist., 297 Mo. 64, 247 S.W. 1004, 1005, in which it is stated: "The purposes for which the district could vote bonds are enumerated by the statute. Section 11127, R.S.1919. It is urged that no power is given to vote bonds for the purpose of 'remodeling' the school building. The statute does authorize bonds 'for the purpose of * * * erecting schoolhouses * * * and furnishing the same, and building additions to and repairing old buildings.' According to the dictionaries the word 'remodel' has, as the only one of its legitimate meanings which could be applicable here, the meaning 'to reconstruct.' In fact, there is nothing included in the word in the sense in which it can be applied to existing buildings in a situation like that in this case, which is not within the statutory language 'erecting schoolhouses * * * and building additions to and repairing old buildings.' Appellant's construction, like a similar one in an almost identical case (Cotter v. Joint School District, 164 Wis. [13], loc. cit. 15, 158 N.W. 80), is, as the Supreme Court of Wisconsin said, 'too narrow. The statute was intended to enable school districts that did not have adequate schoolhouses to obtain them by purchase or erection, and it should receive a liberal construction to effectuate that purpose. The remodeling of a building is more than repairing it or making minor changes therein. The ordinary significance of the term imports a change in the remodeled building practically equivalent to a new one. * * * The inclusion of an old structure into a practically new one does not take the process out of the meaning of the term "erection" used in a broad sense.' The purpose named within the order was within the statute, and was sufficiently conveyed to the voters by the same language used in the notice."

I have found no other cases on the exact question, and none are cited by council; but the following cases throw some light on the issues: Harrell et al. v. Bd. of Com'rs, 206 N.C. 225, 173 S.E. 614; Jewett et al. v. School Dist., 49 Wyo. 277, 54 P.2d 546; Carroll v. Lynchburg, 84 Va. 803, 6 S.E. 133; Delione v. Long Branch Com'rs, 55 N.J.L. 108, 25 A. 274; Caskey v. Edwards, 128 Mo.App. 237, 107 S.W. 37.

If the bonds had been issued and sold the proceeds therefrom could have been used only to "erect a court house" within the meaning of the constitution. "No bonds issued under this article, nor the proceeds thereof, shall be used for any other purpose than that for which they were issued. Any officer who shall apply the same to any other purpose shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than double the amount of the bonds so misapplied, and imprisoned not less than one year: Provided that the proceeds of such bonds may be applied for the redemption of the same." Sec. 33-3915, N.M.Sts.Ann. 1929.

Not only is the public protected by this statute, but any taxpayer could have enjoined the application of these funds to any unlawful purpose.

But the presumption is that the Board of County Commissioners are acting within the law; and that it was the intention not to merely repair the court house or make minor alterations, but to make of it a new building.

Courts must indulge in every prima facie presumption in favor of the good faith of executive officers in the discharge of their duties as such, and that their acts will be legally correct. State ex rel. Davern v. Rose, 140 Wis. 360, 122 N.W. 751, 28 L.R.A.,N.S., 194; Curtis et al. v. Charlevoix Golf Ass'n, 178 Mich. 50, 144 N.W. 818; People ex rel. Foley v. Montez, 48 Colo. 436, 110 P. 639.

"It is within the authorized power of the board of public works to change the grade of the street or alley in the improving of the same * * *; and, being a public statutory body, it has back of it the presumption of law that it did its duty, and in the case at bar that it acted in conformity with the statutory provisions in reference to the improvement of the street and the change of the grade." Butler v. City of Kokomo, 62 Ind.App. 519, 113 N.E. 391, 393.

Also see 22 C.J. "Evidence" §§ 69 and 70.

It is not charged or intimated that the board of county commissioners is not acting in good faith, or that the funds will be spent for any unlawful purpose. In such case we must concede the good faith of the board and presume that the proceedings are regular and within the law. Ellis et al. v. New Mexico Const. Co., 27 N.M. 312, 201 P. 487; Salt Lake County

v. Clinton et al., 39 Utah 462, 117 P. 1075; Hicks v. State, 16 Ala.App. 88, 75 So. 636.

The concern of the majority seems to be over the assumption that the electors were not given the required notice of the object for which it was proposed to issue the bonds, rather than that the board of county commissioners had or would exceed its authority in the application of the funds.

We held in Albuquerque v. Water Supply Co., 24 N.M. 368, 174 P. 217, 221, 5 A.L.R. 519, that the publication of an election notice is directory and unless it is shown that the result would have been different if there had been a strict compliance with the statute, irregularities in the publication of the notice do not invalidate bonds. In that case we stated:

"In the case of Barry v. Board of Education of Clovis, [23 N.M. 465], 169 P: 314, while the point was not actually involved, we said:

" 'Where an election is held under authority of an order of the proper authorities, and in the main conforms to the requirements of the statute, though wanting in some particular not essential to the power to hold such an election, and is acquiesced in by the people and approved by their agent, such irregularities do not render the bonds thus issued void.'

"Following the rule laid down in these cases, we are of the opinion that section 3717, Code 1915, is substantially complied with when the last insertion of the notice was had 13 days prior to the election. There is no showing that any injury resulted by reason of the premature publication of the notice, and there is no evidence of any attempt to defraud or mislead any of the voters, and, apparently, all the voters of the city were fully advised as to the date of the election and the purpose thereof.

"Mere irregularity in connection with an election in the case of the notice, will not of itself invalidate an election, but it must further be shown that, if the statute had been strictly complied with, the result would have been different."

Also see Board of Education of City of Roswell v. Citizens Nat'l Bank, 23 N.M. 205, 167 P. 715; Barry v. Bd. of Education, 23 N.M. 465, 169 P. 314; Ruth v. Oklahoma City et al., 143 Okl. 266, 287 P. 406.

The effect of the majority opinion is to hold that it is presumed, in the absence of evidence, that the county board has, or will act in bad faith and will apply the proceeds of the bond issue to an unlawful purpose, and that the electorate was without knowledge of the proposed use of the funds; with the result that it overrules Barry v. Bd. of Education; Board of Education of City of Roswell v. Citizens Nat'l Bank; Albuquerque v. Water Supply Co., and Ellis et al. v. New Mexico Const. Co., supra.

It is my conclusion that as the word "remodel" can consistently be used in the

sense of erect or build, and only in that sense under the circumstances of this case; that in the absence of a charge or claim that it was otherwise used or that the county board intended an unlawful use of the funds, or that the electorate was misled by its use; the presumption of good faith and legal intent on the part of the board, and of knowledge of the intended use of the funds, on the part of the electorate, should prevail.

The judgment of the district court should be affirmed.