NEW-YORK PRACTICE REPORTS. 179

The People *ex rel.* Peabody agt. The Attorney-General.

---

## SUPREME COURT.

### THE PEOPLE on the relation of CHARLES A. PEABODY agt. THE ATTORNEY-GENERAL.

By the Revised Statutes (2 *R. S.* 582, § 28,) with the same provision re-enacted by the Code, (§ 432,) it is made the duty of the *attorney-general*, and not of the court, to determine whether, in any particular case, it is proper that an action to try the right to an office should be brought or not.

It was the intention of the legislature to transfer the exercise of this discretion from the court to the attorney-general, and thus re-invest him with the power he had at the common law.

The *exercise* of such discretion is, in its nature, a *judicial* act, from which there is no appeal, and over which *courts* have no control.

*Albany Special Term, July*, 1856.

MOTION for mandamus.

The papers upon which the motion was founded state, that at the general election of judges, held in November last, the relator was voted for by the electors of the first judicial district, to fill the vacancy occasioned by the death of ROBERT H. MORRIS, one of the justices of the supreme court.

The relator claims that he was duly elected to fill such vacancy. The relator further alleges that HENRY E. DAVIES, without any legal warrant, authority, or right, has, since the 13th of February, 1856, held, used and excercised the office, and continues so to do. The relator further states, that he desires to prosecute an action to be brought by the people, upon his relation, for the purpose of establishing his right to the office, and that he has made repeated applications to the attorney-general to be permitted, by the agency or advice of some competent counsellor of this court, to be approved by the attorney-general, to commence and prosecute such an action; and that to indemnify the state against the costs of such an action, he had executed and delivered to the attorney-general a bond, the sufficiency of which had been approved by him.

It also appeared, from the papers upon which the motion was founded, that the attorney-general refused to commence the action, or to allow it to be prosecuted in the name of the people. The relator asked for a mandamus to compel him to prosecute the action.

CHARLES O'CONOR & H. L. CLINTON, for relator.
JOHN K. PORTER, for attorney-general.

HARRIS, Justice. At the common law, no one but the officer of the crown could sue out the writ of quo warranto. It was regarded as the king's writ of right, to be issued in case of the usurpation of an office in violation of the king's right. This writ, at an early day, gave place to the more convenient proceeding of an information, in the nature of a quo warranto. It was the practice of the officers of the crown to file informations, in their own discretion, upon the application of private persons; but these were not named as relators in the proceedings. (See Cole on Crim. Informations, 127.)

By the act of 4 and 5 William & Mary, ch. 18, which took effect in 1693, no information could be filed " without express order to be given by the court of king's bench, in open court." The statute of 9 Anne, ch. 20, required that, in informations re-

lating to *corporate* offices or franchises, the name of the relator should be mentioned in the information. From the passage of that act, which was in 1711, it was the practice to insert the name of the relator in all informations in the nature of a *quo warranto*, whether they related to a corporate office or any other.

For a while, after it was referred to the court to determine whether an information should be filed or not, it was very much a matter of course to allow it to be done. In *Rex* agt. *Sargent*, (5 *T. R.* 467,) it was said by Lord Kenyon, chief justice, that " when Lord Mansfield came into the court, he found that informations in the nature of *quo warranto* were had almost for asking. But he soon saw the impolicy and vexation of such a rule, and therefore, before he granted any such application, he canvassed the case ; and, unless he found strong grounds for questioning the defendant's title, he, and the court sitting with him, always refused to let the information go." Ever since that period it has been the practice of the English judges to exercise a discretionary power in granting or withholding an information, according to the particular circumstances of the case.

The same discretionary power was vested in the supreme court of this state upon the organization of our state government. By the fourth section of the act for rendering the proceedings upon writs of mandamus, and informations in the nature of *quo warranto*, more speedy and effectual, passed Feb. 6, 1788, it was provided that, "in case any person or persons shall usurp, intrude into, or unlawfully hold and execute any office or franchise within this state, it shall and may be lawful to and for the attorney-general, *with the leave of the supreme court*, to exhibit one or more informations in the nature of a *quo warranto*, at the relation of any person or persons desiring to sue or prosecute the same, who shall be mentioned in such information, or informations, as the relator or relators." (1 *R. L.* 108.) Under this statute the court exercised the right of determining whether an information should be filed or not.

In *The People* agt. *Sweeting*, (2 *John.* 184,) leave was refused,

merely upon the ground that the term of the office in dispute would expire before the right could be tried.

By the Revised Statutes of 1830, this discretionary power was withdrawn from the court, and vested in the attorney-general. It is provided that "an information in the nature of a *quo warranto* may be filed in the supreme court of this state by the attorney-general, against individuals, upon his own relation, or upon the relation of any private party, and *without applying to such court for leave,* when any person shall usurp, intrude into, or unlawfully hold or exercise any public office," &c. (2 *R. S.* 582, § 28.) The same provision is re-enacted in the 432d section of the Code.

It is now for the attorney-general, and not the court, to determine whether, in any particular case, it is proper that an action to try the right to an office should be brought or not.

That it was the intention of the legislature to transfer the exercise of this discretion from the court to the attorney-general, and thus re-invest him with the power he had at the common law, is evident, I think, from the fact that while thus authorizing the attorney-general to file an information to try the right to a public office, without applying for leave, it still required such leave to be obtained before filing an information against a corporation. (2 *R. S.* 583, § 39; *Code,* § 430.) In the latter case, it is expressly declared to be his duty to institute proceedings, *upon leave being granted* by the supreme court, or a judge thereof.

There is nothing in the language of the statute which indicates an intention, on the part of the legislature, when dispensing with the necessity of applying to the court for leave to commence the action, to surrender all control over the proceeding. On the contrary, it is plain, I think, that it was intended that the attorney-general should, upon the circumstances of each case, as it should be presented to him, determine whether the public interest requires that a suit should be prosecuted. Although private rights are always more or less involved in the action, yet it is, in substance as well as in form, an action on behalf of the people. It must be prosecuted in their name, and

The People *ex rel*. Peabody agt. The Attorney-General.

by the officer whose duty it is to protect their rights. The language of the statute, too, is guarded—"An action may be brought by the attorney-general." It is permissive. The *power* merely is conferred. It is for him to determine whether a fit case is presented.

As to everything but the form, the proceeding stands now as it did at the common law. The usurpation of an office, though it frequently involves little else than private rights, is, in the eye of the law, a public offence. The only remedy is by an action in the name of the people. It is a public prosecution, instituted and conducted by the public prosecutor, under his official obligation and responsibility. It is not the province of the court to control his discretion, or to authorize a private prosecutor to assume his office, and, in his name, to wield the power of public prosecution.

I know it may be said, perhaps in this very case, that, with a fair show of right to an office, a party may be entirely remediless against an intruder. This may be so. It is quite possible that cases may arise in which the disturbing influence of party feeling may so affect the action of the attorney-general, as to result in great injustice to individuals. But this is a question for the consideration of the legislature, not for the court. The power of determining whether the action shall be commenced must exist somewhere. As we have seen, it has sometimes been vested in the court, and sometimes in the public prosecutor. Our legislature have seen fit to invest the attorney-general with this discretion. His office is a public trust. It is a legal presumption that he will do his duty—that he will act with strict impartiality. In this confidence he has been endowed with a large discretion, not only in cases like this, but in other matters of public concern. The exercise of such discretion is, in its nature, a judicial act, from which there is no appeal, and over which courts have no control.

The motion for a mandamus must, therefore, be denied.