Joseph A. Sabafite, J.
These related applications — described below — arise 'out of a suit brought by the Attorney-General under ¡article 23-A of ¡the General Business Law (Martin Act) in which a judgment has been entered. That action was one of many spawned by the- highly publicized -salad oil scandal, a colossal ¡swindle perpetrated by the Allied Crude Vegetable Oil Refining Corporation (Allied) and Anthony De Angelis on numerous commercial and financial institutions.
After a three-year investigation, the Attorney-General on February 14, 1967, served — but did not file — a. complaint against Bunge Corporation (Bunge) and -two of its officers ■alleging fraudulent practices with relation to said swindle. The complaint -alleges 12 causes of action, each in considerable detail. The first cause, summarized very briefly, states that in 1962 and 1963 Bunge was the principal ¡source of financing for Allied’s purchases and sales of commodities; that -the financing was “ collateralized ” by public and field warehouse receipts covering actual commodities in the custody -of warehousemen; that Bunge acquired knowledge of certain specific wrongful manipu *327 Mi OILS of Allied and De Angelis, including knowledge that certain tanks in Hoboken, New Jersey, represented to contain millions of pounds of oil, in fact contained no oil; that Bunge acquired this knowledge as a consequence of Allied’s alleged offer of a $25,000 bribe to induce an .inspector to conceal the fact that certain tanks were empty; that Bunge knew that Allied was increasing its forged warehouse receipts in the hands of the public from $8,000,000 to $82,600,000; that Bunge was a member — and the individual defendants were also officers — of the New Yiork Produce Exchange and owed a duty to the Exchange and to the public to report and reveal such knowledge and failed to do so; that such concealment and suppression constituted ‘ ‘ fraudulent practices ” under article 23-A.
Each of the remaining causes rests on an alleged failure to reveal to the Exchange some additional fact or facts of which defendants acquired knowledge and of the same nature as those alleged in the first cause. In the course of these recitals it is alleged that defendants used “ confidential information for their own profits ” (11th cause) and that subsequent to Allied’s filing a petition in bankruptcy, Bunge settled its short position in oil futures and made a profit of $1,500,000 (10th cause).
The complaint does not allege that specific investors had been defrauded or that Bunge conspired with Allied, and the prayer for relief asks that defendants be enjoined, from continuing the fraudulent practices.
Bunge answered the complaint denying all of its material allegations and setting up affirmative defenses to 10 causes of action. The defendants agreed to a consent judgment — filed simultaneously with .the complaint on March 13, 1967 — on the first cause of action and a discontinuance of the others. The judgment recites that defendants 'adhere to their denials, assert that there is no basis to the complaint and that the judgment shall not be deemed an acknowledgment that any violation of law was committed.
Upon oral argument the moving parties and Bunge enlarged upon the charges and denials, the movants urging that this is the “ key to unlocking the entire salad oil mystery ” and Bunge asserting that the charges were investigated and have been known to the real parties in interest — the insureds — for three years and that no actions have been brought against Bunge based on such charges because they have no justification for doing so.
Turning now to the applications before this court: on April 4, 1967, one bank and five insurance companies joined in one motion for an order (1) vacating the judgment in the Bunge *328 action, (2) reopening the suit, (3) permitting them to intervene and (4) appointing a receiver pursuant to section 353-.a of the General Business Law (Motion No. 116 of May 4,1967). On the same day, the same movants petitioned for an order in the nature of mandamus — pursuant to article 78 of the CPLR — (1) directing the Attorney-General to apply to the court for the appointment of a receiver of the property of respondent Bunge Corporation, (2) assisting them in applying to the ■ court in establishing their claims to said property and (3) malting available to them the evidence collected in the course of the investigation (Motion No. 115 of May 4, 1967). Thereafter, 16 other insurance companies jointly applied for the same relief sought by the motion and also 'that sought by the petition just described' (Nos. 117,114). The next two motions are by Bunge to dismiss the two petitions -on jurisdictional grounds and for insufficiency (Nos. 76,119); the Attorney-General filed answers to the petition and an affidavit opposing the motion and the petitions. These proceedings are consolidated and will be disposed of together. The movants and petitioners are herein referred to as the “ moving parties.”
From the papers and -oral arguments it appears that the interest of the moving parties in the Bunge case arises from the pendency of at least 41 separate actions by victims of the swindle against numerous insurers, claiming damages in excess of $250,000,000; they assert that these claimants are attempting to shift the greater portion, of their losses to the insurance industry.- In fact, certain insurers have already paid judgments in the amount -of $4,500,000. Losses resulted from loans made on the strength of fraudulent warehouse receipts for nonexistent oil. The insurance companies issued policies insuring banks and others that the oil did exist. They contend that Bunge, when it learned in 1962 that Allied was missing $7,000,000 worth of oil, continued to do business with Allied but took steps to insulate its-elf against Allied’s insolvency. Bunge achieved such insulation, it is claimed, by inserting between itself and Allied, unsuspecting third parties. Moreover, it is charged that after taking these protective -steps, Bunge ‘1 delivered the fatal blow ’ ’ to Allied by selling short, thus driving down the prices of commodity futures, and resulting in margin calls which Allied could not meet. Bunge, it is further charged, not -only extricated itself .from a vulnerable position prior to Allied’s bankruptcy but also profited from the swindle and .should be made to disgorge the fruits -of its fraudulent practices and that the same be returned to the aggrieved public. On the other hand, Bunge vigorously denies any wrongdoing; argues that there is no basis for any *329 suit against Bunge and invites the moving parties — if they really believe they have a good cause — to bring a lawsuit against them.
The argument for relief here is that the Attorney-General was obliged under the Martin Act to have a receiver appointed pursuant to section 353-a; that the decision of the Attorney-General to publicize and terminate the action on the same day that he filed the complaint prevented the applicants as aggrieved parties from seeking leave to intervene and was arbitrary, capricious and an abuse of discretion; that they have standing to bring this proceeding, as they will suffer losses by the fraudulent practices of Bunge which a receivership would reduce or, in any event, that they have standing as members of the public. In opposition, the Attorney-General and respondents argue that relief pursuant to article 78 of the CPLR is not available, that the discretion exercised by the Attorney-General is not reviewable in such proceeding; the moving parties were not bound by the prior judgment and have no standing to bring this proceeding.
Upon analysis, the right to any of the requested relief comes back to and rests essentially on one contention: that the court has the power to compel the Attorney-General to apply for the appointment or a receiver. The moving parties assert that when the Attorney-General acts to enforce the Martin Act he is not doing so as the State’s chief legal officer but as an administrative officer, to wit, as a securities commissioner. ' As such, they argue, having failed to seek appointment of a receiver, the Attorney-General may be directed to do so.
The moving parties concede this is a case of first impression and rely heavily on cases which have stated in substance that, ‘ ‘ In making an investigation under the power granted- to him by section 352 of the General Business Law, the Attorney-General acts as an executive official performing an administrative duty ” (Carlisle v. Bennett, 268 N. Y. 212, 217, citing Dunham v. Ottinger, 243 N. Y. 423, 433). In the Carlisle case, plaintiff sued to enjoin the Attorney-General from examining plaintiff regarding the sale of securities under the Martin Act and from moving to punish plaintiff for failure to obey subpoenas. The court dismissed the complaint, holding that the proper remedy is by motion to quash, vacate or modify the subpoenas. In the Dunham case, a stock broker also sought similar relief attacking the act as being unconstitutional. Again, the complaint was dismissed.
Obviously, each case was concerned with restraining the Attorney-General from doing something. Neither case was con *330 cerned with the question of affirmatively compelling the exercise of discretion by the Attorney-General. And neither ease holds that the Attorney-General is transformed into a securities Commissioner who becomes .subject to the directions of the court as to how he shall perform his duties. No case has been cited by the parties nor has the court found any which holds that the Attorney-General may be compelled to exercise his discretion either to make an investigation or to institute suit, and if he does sue for ian injunction that he may also be compelled to seek a receiver; and, finally, that in pursuing such a suit for an injunction he must provide a time interval between the filing of the complaint and the entry of a consent judgment.
The Martin Act itself in so many words explicitly vests such discretion in the Attorney-General. Section 352 of the General Business Law provides that if the Attorney-General believes it to be dm ¡the public interest “he may in his discretion ” investigate transactions which he believes are fraudulent. Section 353 provides that the Attorney-General may bring an action to enjoin the person or corporation engaging in such practices. Section 353-a provides that in any such action the court may appoint a receiver and allow intervention by persons whose claims are not established. This is obviously not a situation where the court may make such an appointment sua sponte but it is one for the Attorney-General ¡to initiate after his investigation satisfies him that such action is desirable. The reading of sections 352, 353 and 353-a leads to the conclusion .that the initiation and prosecution of what steps, if any, are to be taken by the Attorney-General are wholly within bis discretion.
It may be that in the investigation phase, pursuant to section 352, the Attorney-General is then acting ‘1 as an executive officer performing an administrative duty ” (Carlislev. Bennett, supra; emphasis supplied). The performance of an administrative function does not convert him into 'an administrative officer. Whatever action be taken under sections 353 or 353-a, he is acting as the chief legal officer of the State. Indeed, under section 63 of the Executive Law as well as the pertinent provisions of the General Business Law, the Attorney-General is the only person empowered to take such action.
There is ample authority for the proposition that in the exercise of such discretion he cannot be hampered by the courts. The wisdom and practical necessity behind such a rule are obvious. It would be a vexatious practice for a court to substitute its judgment for that of the Attorney-General by intervening to review the conduct of hi® high office or by dictating the manner in which he shall proceed to discharge the solemn *331 responsibilities imposed upon Mm. And it is immaterial should the court deem his actions to be imprudent or otherwise objectionable.
In People ex rel. Peabody v. Attorney General (22 Barb. 114 [1856]) an elected Supreme Court Justice moved for mandamus to compel the Attorney-General to sue out a writ of quo warranto against another Justice. Prior to 1830 the Attorney-General had to seek permission from the Supreme Court before he could sue to try out a disputed title to public office. In 1830 an amendment to the statute withdrew this discretionary power from the court and vested it in the Attorney-General. The court in denying the motion, said (p. 117): “ The language of the statute, too, is guarded. An action may be brought by the attorney general. It is permissive. The power merely is conferred: it is for him to determine whether a fit case is presented” (emphasis in opinion). The meaning of the word “ may ” used in the statute discussed above should be compared with the meaning of the stronger provision: may “ in his discretion ” used in the Martin Act.
The court continues (p. 118): “ The power of determining whether the action shall be commenced must exist somewhere. As we have seen, it has sometimes been vested in the court, and sometimes in the public prosecutor. Our legislature has seen fit to inve-st the attorney general with tMs discretion. His office is a public trust. It is a legal presumption that he will do his duty; that he will act with strict impartiality. In this confidence he has been endowed with a large discretion, not only in cases like tMs, but in other matters, of public concern. The exercise of such discretion is, in its nature, a judicial act, from wMch there is no appeal, and over wMch the courts have no control.” TMs case was cited with approval in People ex rel. Demarest v. Fairchild (67 N. Y. 334, 337). In People v. Ballard (134 N. Y. 269, 293) the Court of Appeals restated that position holding: “ We think that the question as to what the public interests require is committed to the absolute discretion of the attorney-general, and that it cannot be made the subject of inquiry by the courts. If he abuses the great power intrusted to him, a remedy may be found in Ms removal from office, or in the election of a successor worthy of the high position.” The same thought appears in the Dunham case (243 N. Y. 423, 438, supra). (See, also, Matter of Lewis v. Lefkowitz, 32 Misc 2d 434, affd. 17 A D 2d 778; Carlisle v. Bennett, 268 N. Y. 212, 217, supra.)
Therefore, it is quite clear that this court may not review the exercise of discretion of the Attorney-General. If such power does not lie, neither has the court, nor any member of the public, *332 the right to prescribe the method by which the Attorney-General may investigate or prosecute or choose between the remedies afforded.
Finally, under section 353-a, defrauded investors are permitted to intervene. This is not the usual type of Martin Act case where victimized purchasers of securities are seeking relief. The Attorney-General contends that none of the moving parties —who appear to be creditors or potential creditors — can be •said to fall into such a category. Whether this be so or not, intervention, however, is permitted only when the court has appointed a receiver. As the Attorney-General cannot be compelled to move for such appointment, the court may not name one. Consequently, the moving parties may not intervene.
Accordingly, the motions are denied in all respects, and the petitions are dismissed.
This determination renders it unnecessary to pass upon any other contention.