552 P.2d 805

**EASTERN NAVAJO INDUSTRIES, INC., Appellant,**

**v.**

**BUREAU OF REVENUE of the State of New Mexico, Appellee.**

**No. 2188.**

Court of Appeals of New Mexico.

June 29, 1976.

Certiorari Denied July 27, 1976.

Tommy D. Hughes, Schlenker, Parker, Payne & Wellborn, Albuquerque, for appellant.

Toney Anaya, Atty. Gen., Santa Fe, Vernon O. Henning, Bureau of Revenue, Asst. Atty. Gen., Santa Fe, for appellee.

## OPINION

HERNANDEZ, Judge.

Taxpayer, Eastern Navajo Industries, appeals pursuant to § 72–13–39, N.M.S.A. 1953 (Repl. Vol. 10, Supp.1975), a Decision and Order of the Commissioner of the Bureau of Revenue assessing gross receipts to this taxpayer.

The fundamental issue in this appeal is whether incorporation by the taxpayer under our Business Corporation Act, Sections 51–24–1 to 51–31–11, N.M.S.A. 1953 (Repl. Vol. 8, pt. 1, Supp.1975) will preclude consideration of the ·Indian ethnicity of its stockholders in determining the correctness of the Bureau of Revenue's assessment.

Most of the pertinent facts are set out in the Commissioner's Decision and Order:

"2. The taxpayer is a New Mexico corporation incorporated pursuant to New Mexico law with offices and a plant at Church Rock, New Mexico. The plant and offices are not located on the Navajo Reservation but are located on 'trust' land owned by the United States. The trust land is administered by the Navajo Tribe.

"3. The taxpayer entered into contracts with the Navajo Housing Authority (Authority) to construct houses on the Navajo Indian Reservation. The Authority was to be the purchaser of the houses. The Authority was an entity created and organized under ordinances of the Navajo Indian Tribe.

"6. The funds of the Authority which it used to pay the taxpayer under the contracts referred to in paragraph 3 above were received by the Authority from the United States.

"7. The stock of the taxpayer was owned as follows: 51% by individual Navajo Indians; 49% by two individuals—Mr. Taylor and Mr. McKinney—who are not Navajo Indians although these individuals are related by blood with other Indian tribes. Messrs. Taylor and McKinney were officers of the corporation and on the Board of Directors. Three Navajo Indians were directors and officers of the taxpayer.

"9. The protested portion of the assessment relates to receipts by the tax-

payer from building houses on that part of the Navajo Reservation located within the State of New Mexico. These houses were built for the Authority and were designed to be occupied by members of the Navajo Tribe."

The taxpayer raised four points of error. We find the third dispositive of this appeal: III) "The State of New Mexico cannot impose or collect a gross receipts tax on taxpayer since such a tax is a severe burden upon and a hindrance to the self-government of the Navajo Tribe."

The position of the Bureau has two aspects. The Bureau argues that "[o]rganizing a modern business corporation, the character of which is determined by state law, is a departure from the ancestral customs and folkways of Indian people. Once, that step has been taken, the participants have made the choice, for better or worse, to separate themselves, at least for purposes of the corporate activity, from those traditions." The second point argued by the Bureau is that "[n]othing in the record even arguably supports a conclusion that tribal self-government is being hindered. There is no conflict between the State of New Mexico assessing the gross receipts tax against Eastern Navajo and the Tribe's efforts to provide housing for its people." We do not agree.

Other facts important to our determination appear in the record. The corporation was formed at the instigation and under the auspices of the Navajo Tribal Council. Messrs. Taylor and McKinney were approached by members of the Chairman's Office of the Navajo Tribe and by the Eastern Navajo Agency, a division of the Bureau of Indian Affairs. The Eastern Navajo Agency assembled the 54 Indians necessary to comprise the 51% Indian shareholder majority. Mr. McKinney testified, "We had nothing to do as far as what Indian received any stock. These names were given to us and the amount of stock to be issued to each one of then by the Navajo Tribe and the Eastern Navajo Agency." These shareholders bought stock in the company with loans from the federal government under a program designed to facilitate Indian self-help. McKinney testified: "We had to qualify through the Federal Housing Administration as an Indian-owned organization, . . . we have that certificate of qualification."

■ Further testimony established that the funds used by the Navajo Housing Authority to form the corporation were obtained from the Indian Business Development Fund. We take judicial notice of 25 C.F.R. § 80 (1971), which sets out the provisions of the Indian Business Development Fund, as authorized by 25 U.S.C. § 13 (1970):

"80.2 *Purpose and scope.* This part sets forth the regulations for the administration of the Indian Business Development Fund. The purpose of the fund is to stimulate Indian entrepreneurship and employment. This purpose is achieved by providing non-reimbursable, supplemental capital grants to establish profit-making Indian economic enterprises which will employ Indians."

"80.12 *Indian groups.* Any group of eligible individual Indians which may legally engage in private enterprise may apply for a grant. *This includes Indian corporations organized under Federal or State law* and, if authorized to enter contracts on behalf of an Indian tribe, those organizations commonly known as 'Tribal Enterprises,' which are economic enterprises. However, for *Indian corporations,* fifty-one percent [51%] or more of the stock must be owned by eligible Indians or by an Indian tribe." [Emphasis ours.]

Under project requirements, these regulations provided:

"§ 80.41 *Eligibility requirements.* The project must satisfy all the following requirements to be eligible for consideration:

(a) It is a profit-making enterprise which generates jobs for Indians.

(b) It is owned or controlled by an *Indian group* or an individual Indian.

(c) It is located on a reservation or in the immediate vicinity . . . .

(d) It must have the potential to become a profitable operation within the total cost of establishing the business. . . ."

"80.62 *Authority of Area Director.* Area Directors are authorized to determine eligibility of *Indian groups* not serviced by a single Superintendent, to receive their applications, and to recommend approval or disapproval of the application to the Commissioner [of Indian Affairs]." [Emphasis ours.]

Incorporation of this taxpayer is consistent with the method of incorporation sanctioned by Navajo tribal law for purposes of qualifying for tribal loans. Title 5, N. T.C. § 211, which states that the purpose of this subchapter of the Code is "to establish procedures to govern all future loans by the Tribe to members, cooperative and private corporations," defines a "private corporation" as a:

". . . corporation organized by a group of Tribal members, or by Tribal members and others, pursuant to the laws of the United States or of states within which the Navajo jurisdiction extends and wherein the business or undertaking is to be located. The majority of stock of such corporation must be owned by Tribal members."

■ Thus, federal regulations defining federal loan policy for Indian enterprises and the Navajo Tribal Code specifically authorize incorporation of an Indian commercial enterprise under state law without the corresponding loss of "Indianness" that is argued by the Bureau of Revenue in the instant case.

■ We also take judicial notice of the following sections of the Navajo Tribal Code covering regulation and control of businesses within the Navajo Nation and Community development.

The Code at Title 5, N.T.C. § 51 states: "The Navajo Tribal Council, in order to promote the further economic development of the Navajo People, and in order to clearly establish and exercise the Navajo Tribe's authority to regulate the conduct and operations of business within the Navajo Nation, hereby declares that the Navajo Tribe of Indians has the sole and exclusive authority to grant, deny, or withdraw the privilege of doing business within the Navajo Nation, except where such authority is withdrawn from the Navajo Tribe by the Constitution and applicable laws of the United States."

The Code at Title 6, N.T.C. § 354 states: "The [Navajo Housing] Authority shall be organized and operated for the purposes of: (1) Remedying in the areas subject to the jurisdiction of the Navajo Tribe unsafe and insanitary housing conditions, that are injurious to the public health, safety and morals; (2) Alleviating the acute shortage of decent, safe and sanitary dwellings for families of low income; and (3) Providing employment opportunities in areas subject to the jurisdiction of the Navajo Tribe through the reconstruction, improvement, extention, alteration or repair and operating of low-rent dwellings."

The Bureau refers to *United States v. State Tax Com'n. of State of Miss.,* 505 F.2d 633 (5th Cir. 1974) in support of its position. In that case, the United States brought suit on behalf of the Mississippi Band of Choctaw Indians to enjoin the Mississippi State Tax Commission from assessing and collecting a sales tax from a non-profit corporation formed under the laws of the State of Mississippi. The corporation was established for the purpose of building houses under contract with the Choctaw Housing Authority. The court, after indulging in a considerable amount of dicta, determined that the federal district

court was without jurisdiction to entertain the suit because there was in fact no existing Mississippi Band of Choctaw Indians.

It is a portion of this dicta that the Bureau calls to our attention. The Court of Appeals for the Fifth Circuit noted:

"The Mississippi rule is the same as the general rule, that a corporation is a creature of the law and it is a legal personality, separate and apart from its owners. [Citations omitted.]

. . . . . .

Thus in an effort to avoid the taxes which Mississippi corporations are required to pay, [the corporation] has cast itself in the untenable role of claiming the benefits and denying the burdens of the status which its incorporators voluntarily sought."

That a corporation and its stockholders are separate entities is the law in New Mexico as well. However, it is also the law in New Mexico that a court is not always bound to regard the legal status of a corporation as an existence in itself regardless of its stockholders. Our Supreme Court in *State T. & A. et al. v. Hermosa L. & C. Co.*, 30 N.M. 566, 572, 240 P. 469, 472 (1925) quoted with approval the following from Thompson on Corporations, § 10:

"The proposition that a corporation has an existence separate and distinct from its membership has its limitations. It must be noted that this separate existence is for particular purposes. It must also be remembered that there can be no corporate existence without persons to compose it; there can be no association without associates. This separate existence is to a certain extent a legal fiction. Whenever necessary for the interests of the public or for the protection or enforcement of the rights of the membership, courts will disregard this legal fiction and operate upon both the corporation and the persons composing it."

Even if the above quotation from *United States v. State Tax Com'n. of State*

*of Miss.*, supra, were not obiter dictum, we could not follow it for the reason that 25 C.F.R., § 80.12, supra, explicitly requires consideration of the ethnicity of the stockholders of corporations who would qualify under its terms: ". . . for Indian corporations, fifty-one percent [51%] or more of the stock must be owned by eligible Indians or by an Indian tribe." Under this federal standard, taxpayer is an Indian corporation.

To disregard the Indian ethnicity of taxpayer's shareholders would be to fail to recognize the specific directives of the Indian Business Development Fund Act. That is to say we must look beyond the taxpayer's corporate form to the fact that 51% of its stock is owned by individual Navajo Indians. Consequently, there is no alternative but to view the assessment by the Bureau of Revenue as a tax upon Indians doing business upon an Indian land or reservation. And as we stated in *Hunt v. O'Cheskey*, 85 N.M. 381, 512 P.2d 954 (Ct. App.1973):

"New Mexico's attempt to tax the gross receipts of an Indian whose business is carried on exclusively upon reservation land is an attempt to determine what business may be carried on within the reservation. Such an attempt is an attempt to interfere with Indian self-government.

. . . New Mexico does not have the authority to tax the privilege of an Indian to engage in business on an Indian reservation."

We believe that some comment concerning the Buck Act, 4 U.S.C. § 105 through § 109 is necessary in the consideration of this matter.

Section 105(a) provides:

"No person shall be relieved from liability for payment of, collection of, or accounting for any sales or use tax levied by any State, or by any duly constituted taxing authority therein, having jurisdiction to levy such a tax, on the ground that the sale or use, with respect to

which such tax is levied, occurred in whole or in part within a Federal area; and such State or taxing authority shall have full jurisdiction and power to levy and collect any such tax in any Federal area within such State to the same extent and with the same effect as though such area was not a Federal area."

Section 109 provides:

"Nothing in sections 105 and 106 of this title shall be deemed to authorize the levy or collection of any tax on or from any Indian not otherwise taxed."

The Supreme Court of the United States in *McClanahan v. Arizona State Tax Com'n.*, 411 U.S. 164, 93 S.Ct. 1257, 36 L. Ed.2d 129 (1973) interpreted the Buck Act as follows in deciding an income tax assessment by the State of Arizona:

"Indeed, Congress' intent to maintain the tax-exempt status of reservation Indians is especially clear in light of the Buck Act, 4 U.S.C. § 105 *et seq.*, which provides comprehensive federal guidance for state taxation of those living within federal areas. . . . [B]ut § 109 expressly provides that '[n]othing in sections 105 and 106 of this title shall be deemed to authorize the levy or collection of any tax on or from any Indian not otherwise taxed.' To be sure, the language of the statute itself does not make clear whether the reference to 'any Indian not otherwise taxed' was intended to apply to reservation Indians earning their income on the reservation. But the legislative history makes plain that this proviso was meant to exempt reservation Indians from coverage of the Buck Act. . . ."

Holding as we do, that taxpayer is Indian, it is apparent that the taxpayer is exempt from the operation of the Buck Act.

A case recently reviewed by the Court of Appeals, *G. M. Shupe, Inc. v. Bureau of Revenue*, No. 2183, 89 N.M. 265, 550 P.2d 277 (1976), is readily distinguishable from the present case. The taxpayer in *Shupe* is a Washington corporation, qualified to do business in New Mexico. It is constructing a dam on the Nambe Pueblo under contract with the U.S. Department of the Interior, Bureau of Reclamation. The taxpayer presented the issue that the gross receipts tax was illegally imposed because taxpayer's activities were on Indian land. This court held that the tax was correctly assessed to this corporation for two reasons: (1) taxpayer corporation was not an Indian entity, and (2) the imposition of the tax does not infringe on Indian rights of self-government.

■  Our holding in the present case is the converse. Eastern Navajo Industries is an Indian entity, according to federal definition, so that the imposition of the gross receipts tax on this taxpayer constitutes an interference with Indian self-government.

The Commissioner was in error in his Decision and Order for the reasons stated above and consequently the assessment is annulled.

IT IS SO ORDERED.

LOPEZ, J., concurs.

SUTIN, J., dissenting.

SUTIN, Judge (dissenting).

The majority opinion has adopted a principle of law unknown in American jurisprudence on Indian Law—that a domestic business corporation which services an Indian tribe is exempt from the provisions of the Gross Receipts Tax Act because the imposition of the tax is a severe burden on the self-government of an Indian tribe. I dissent.

A.  *Facts Most Favorable to Decision*

Taxpayer is a New Mexico business corporation with offices and a plant at Church Rock, New Mexico. The plant is located on "trust" land owned by the United States and administered by the Navajo Indian Tribe.

Taxpayer is a private manufacturer of modular and prefabricated homes; it was not an agent, an agency, or any instrumen-

tality of the governing body of the Navajo Tribe or the United States. Fifty-one percent of the corporate taxpayer is owned by individual Navajo Indians, and forty-nine percent is owned by Taylor and McKinney, officers of the corporation. Taxpayer qualified under 25 C.F.R. § 80.12 to obtain a federal grant, the money to be used in performing services for the Navajo Housing Authority.

Taxpayer entered into contracts with the Navajo Housing Authority. One was an Agreement of Sale, which provided that taxpayer would sell structures to Navajo Housing Authority "to be built on real property . . . situated at several locations on NAVAJO TRIBAL LANDS . . . ." The other was a Contract of Sale, which provided for the sale of a completed "Property" which consisted principally of eighty dwelling units ". . . upon lands situated in Navajo, New Mexico and Church Rock, New Mexico . . . ."

Taxpayer purchased the raw materials, constructed the component parts, and assembled them into modular and prefabricated units. The modular home was a unit completed in sections at the plant, and hauled out on a trailer, with the sections assembled on the reservation. The prefabricated home was built in component parts, which were taken to the reservation and assembled.

Thereafter, taxpayer did its excavation and dirt work and completed the building of the homes on the Indian reservation.

B. *The imposition of a tax on a domestic corporation, if a severe economic burden upon the Navajo Tribe, the tax does not affect the self-government of the Tribe.*

The majority opinion reverses the Commissioner because the imposition of the gross receipts tax is a severe burden upon and a hindrance to the self-government of the Navajo Tribe. The opinion is based upon the ethnicity of the Indian stockholders of taxpayer who qualify taxpayer under 25 C.F.R. § 80.12 to borrow money from the federal government. The argument is syllogistic. For purposes of obtaining a federal grant to engage in rendering services to the Navajo Housing Authority, taxpayer is an "Indian corporation". The Navajo Housing Authority shall improve low rent dwellings. Therefore, the gross receipts tax imposed on taxpayer is a severe burden upon the self-government of the Navajo Tribe.

The tax is not imposed on Indians or Indian lands. It is imposed on taxpayer. It has no effect upon the self-government of the Tribe. If the Navajo Tribe desires to pay the tax, the tax may become an economic burden.

The concept proposed by the majority opinion appears to be a matter of first impression in the United States. No authority was cited and none has been found that an "Indian corporation", organized under the corporate laws of New Mexico, and engaged in private enterprise, is exempt from the payment of a gross receipts tax, because this payment by the corporation is a severe economic burden on an Indian tribe.

To approve this concept as a rule of law means that the government and people of this State must forego the economic benefit.

I return to the philosophical rule stated in my concurring opinion in *G. M. Shupe, Inc. v. Bureau of Revenue*, No. 2183, 89 N.M. 265, 550 P.2d 277 (Ct.App.), decided April 13, 1976; cert. denied, 89 N.M. 321, 551 P.2d 1368 (1976). Even if the imposition of the tax affected Indian self-government, when the existence of an Indian tribe within this State obstructs the operation of state laws and the welfare of its citizens, the inherent sovereignty of the tribe must give way. Taxpayer must pay the tax for the welfare of the government and the people in New Mexico because this economic benefit takes precedence over the burdens of the Indians on the reservation. The federal government is burdened with, and should assist in, the economic development of the Indians on the reservation. It

does this by loaning taxpayer large sums of money to engage in services on and off the Indian reservation for the benefit of the Indians. If taxpayer was a unit created under the Navajo Tribal Code, taxpayer would not be subject to the tax.

It has been held that New Mexico, in terms of its general power, has the right to tax all Indian land and Indian activity located or occurring outside of an Indian reservation, *unless Congress forbade it.* This tax was imposed on the Mescalero Apache Tribe ski resort built on federal land. *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973). Surely this tax was a severe economic burden on the tribe and interfered with its self-government. If an Indian tribe can be taxed for business conducted on federal land with non-Indians, then a non-Indian domestic corporation engaged in business on trust lands, which renders services to an Indian tribe on the reservation, is also subject to the tax. Indian and non-Indian business relationships are subject to state taxes, except where the non-Indian engages in business on the Indian reservation, or the non-Indian engages in business as an agency of the tribe.

Congress did not forbid New Mexico to impose a tax on a state "Indian corporation" referred to by this name in 25 C.F.R. § 80.12.

In *Palm Springs Spa, Inc. v. County of Riverside,* 18 Cal.App.3d 372, 95 Cal.Rptr. 879 (1971), the Court said:

   It cannot be said that the taxation of the possessory interest of non-Indians on federal land held in trust for Indians is an area inherently requiring uniform national regulation. Indeed, the United States Supreme Court has recognized the ability of local authorities to impose taxes of certain types on the activities of private persons conducted on Indian trust or other federal land. [Citations omitted].

   *Neither can we find evidence of a congressional intent to preempt the field of regulating commercial activities between Indians and non-Indians.* [Emphasis added]. [95 Cal.Rptr. at 883].

C. *New Mexico has jurisdiction to impose a gross receipts tax.*

Taxpayer contends that the State of New Mexico does not have jurisdiction to impose a gross receipts tax on a corporation operating within the lands of the Navajo Tribe.

*First,* it is now firmly established that New Mexico has jurisdiction to tax a foreign corporation, authorized to do business in New Mexico, whose work is performed on Indian lands. *G. M. Shupe, Inc. v. Bureau of Revenue,* supra.

Taxpayer agreed to sell houses to Navajo Housing Authority "to be built on real property . . . situated at several locations on NAVAJO TRIBAL LANDS . . . ." Taxpayer built the houses on "trust" land and on the reservation. "It is common ground here that *Indian conduct* occurring on the trust allotments is beyond the State's jurisdiction, being instead the proper concern of tribal or federal authorities." [Emphasis added]. *DeCoteau v. District County Court,* 420 U.S. 425, 428, 95 S.Ct. 1082, 1085, 43 L.Ed.2d 300, 305 (1975). Taxpayer is not an Indian. It rendered the service necessary to fix the houses for use on the reservation. To build a building means to erect a structure fixed on the soil. *State v. Ornelas,* 42 N.M. 17, 74 P.2d 723 (1937); *Board of Com'rs of Guadalupe County v. State,* 43 N.M. 409, 94 P.2d 515 (1939). Taxpayer accomplished this fact. It fixed the houses on the soil.

In *Hunt v. O'Cheskey,* 85 N.M. 381, 387, 512 P.2d 954, 960 (Ct.App.1973), this Court said:

   Taxation is largely a matter of jurisdiction. As early as 1819 the Supreme Court pointed out that there are limits to a State's power to tax, that taxation power, flowing from jurisdiction,

   " * * * is an incident of sovereignty, and is co-extensive with that to

which it is an incident. *All subjects over which the sovereign power of a State extends, are objects of taxation; but those over which it does not extend, are, upon the soundest principles, exempt from taxation."*

*M'Culloch v. Maryland*, 4 Wheat. 315, 4 L.Ed. 579 (1819). Similarly, a noted authority on Indian law has commented, "To the extent that *Indians and Indian property within an Indian reservation are not subject to State laws, they are not subject to State tax laws."* F. Cohen, Handbook of Federal Indian Law 254 (1970). [Emphasis added].

For a further discussion of "The State's Power to Tax", see Price, Law and the American Indian, pp. 251 to 276 (1973).

Taxpayer is a corporation over which the sovereign power of a state extends.

*Second*, a domestic private business corporation, controlled by Indians, falls within the same status and category as all other private business corporations that do business with an Indian tribe. The racial, religious or national origins of stockholders have no effect on the character of a corporate business entity. Taxpayer claims that a corporation controlled by Indians makes the corporation an "Indian" on the same level as an incorporated pueblo. I can understand its pride, albeit not its phylogeny. Taxpayer cannot direct us to any instance in American Indian history where a private business corporation controlled by Indians evolved into an entity which it calls "Indianness". For incorporated pueblos and federal Indian chartered corporations, see *Mescalero Apache Tribe v. Jones*, 83 N.M. 158, 489 P.2d 666 (Ct.App.1971) (Sutin, J., concurring opinion), rev'd in part, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973). The gross receipts tax assessed on the Mescalero Apache Tribe was affirmed.

A corporation and stockholders of a corporation are separate entities, *Shillinglaw v. Owen Shillinglaw Fuel Company*, 70 N.M. 65, 370 P.2d 502 (1962), for tax purposes. *Coca-Cola Bottling Co. of Gallup v.*

*United States*, 443 F.2d 1253 (10th Cir. 1971). This same principle applies to a domestic corporation with Indian stockholders which voluntarily chooses to engage in business in corporate form. It cannot seek the benefits of state corporate law and deny the burden of the status which its incorporators voluntarily sought. *United States v. State Tax Com'n of State of Miss.*, 505 F.2d 633 (5th Cir. 1974). Taxpayer wants all of the benefits of New Mexico corporate law, but it does not want to assume any of its burdens.

*Third*, imposition of a gross receipts tax on a domestic business corporation that builds homes on Indian lands does not constitute any control over Indian lands. Taxpayer seeks to place itself in the position of the Navajo Tribe to escape taxation. It relies on *Hunt v. O'Cheskey*, supra. This case holds that New Mexico may not tax gross receipts of *Indians residing on a reservation* when the gross receipts involved are derived solely from activities within the reservation. The reason is that the State, based on its lack of control over Indian lands, cannot determine what business may be carried on by *Indians* on an Indian reservation. See also, *Your Food Stores, Inc. (NSL) v. Village of Espanola*, 68 N.M. 327, 361 P.2d 950 (1961).

Taxpayer, however, is not an "Indian", and cannot become one by clothing itself with the apparatus of a domestic business corporation.

D. *Taxpayer was not entitled to deduction of gross receipts.*

Taxpayer seeks relief under § 72–16A–14.9, N.M.S.A.1953 (Repl. Vol. 10, pt. 2, 1973 Supp.). It provides in part:

Receipts from selling tangible personal property . . . to the governing body of any Indian tribe or Indian pueblo for use on Indian reservations or pueblo grants, may be deducted from gross receipts.

Taxpayer claims that its receipts are deductible because it sold modular and pre-

fabricated houses, i. e., tangible personal property, to the Navajo Housing Authority.

We must determine what is meant by taxpayer "selling tangible personal property" to the Navajo Housing Authority. By definition, " 'selling' means any transfer of [tangible personal] property for consideration *or any performance of service for consideration.*" [Emphasis added]. Section 72–16A–3(B), (I).

(1) A house which is affixed to the soil on the Navajo reservation is not tangible personal property. It is real property. (2) To construct is to build in the ordinary course of business, and a construction activity is a "service", and all tangible personal property is a component part of that service. Section 72–16A–3(C), (K).

This means that, when a taxpayer *builds* a home, this constitutes a "service". In rendering this service, all tangible personal property that goes into the *assembly* of the home, such as the sections, trusses, roofing, nails, etc., become a component part of the *building* process.

In the instant case, taxpayer was engaged in rendering a service, not in the business of selling tangible personal property. Taxpayer would be engaged in selling tangible personal property if it sold the component parts of the home to the Navajo Tribe, and the Tribe built the homes on the reservation. Under some limited factual situations, taxpayer's receipts could result "from selling tangible personal property . . . to the governing body of" the Navajo Tribe within the meaning of § 72–16A–14.9, supra.

The Commissioner decided that "The taxpayer entered into contracts with the Navajo Housing Authority (Authority) *to*

*construct houses on the Navajo Indian Reservation.* . . . The modular or prefabricated units were used by the taxpayer in *building houses on the Navajo Reservation.*" [Emphasis added]. Taxpayer did not contest the emphasized language.

This decision is supported by substantial evidence. Taxpayer was not only a manufacturer who made and assembled component parts of the house, assembled and sold the houses, but it built the houses on the Navajo Reservation. It was in the "construction" business and rendered a "service".

Taxpayer relies on *Evco v. Jones*, 81 N. M. 724, 472 P.2d 987 (Ct.App.1970); 83 N.M. 110, 488 P.2d 1214 (Ct.App.1971), rev'd on other grounds, 409 U.S. 91, 93 S. Ct. 349, 34 L.Ed.2d 325 (1972). For an analysis of *Evco*, see *Advance Schools, Inc. v. Bureau of Revenue*, 89 N.M. 633, 548 P.2d 95 (Ct.App.1975) (Sutin, J., dissenting); rev'd, 89 N.M. 79, 547 P.2d 562 (1976).

Evco was engaged in business as a designer or creator of instructional or educational programs. It entered into contracts with agencies of the federal government. These items constituted sales of *finished* items, i. e., tangible personal property. Receipts from these sales were exempt from the gross receipts tax because the principal objective of the contracts was to secure from the taxpayer the *finished* items. Services were merely incidental. The reverse is true in the instant case. The principal objective of the contracts between taxpayer and Navajo Housing Authority was to secure from the taxpayer a service, the building of homes.

Taxpayer was not entitled to a deduction of receipts from selling the homes to the Navajo Tribe.