**AIRVATOR, INC., a North Dakota corporation, Plaintiff and Appellant,**

v.

**TURTLE MOUNTAIN MANUFACTURING COMPANY, a North Dakota corporation, Defendant and Appellee.**

Civ. No. 10207.

Supreme Court of North Dakota.

Jan. 27, 1983.

R. Lee Hamilton, Grand Forks, for plaintiff and appellant.

Garcia & Garcia, Devils Lake, for defendant and appellee; argued by David Garcia, Devils Lake.

SAND, Justice.

Airvator, Inc. (Airvator), a North Dakota corporation, appealed from a district court judgment[1] dismissing its complaint against Turtle Mountain Manufacturing Co. (Turtle Mountain Manufacturing), a North Dakota corporation, for lack of subject matter jurisdiction.

Airvator brought an action in state district court against Turtle Mountain Manufacturing for alleged breach of contract and for general and special money damages. Turtle Mountain Manufacturing moved, pursuant to Rule 12(b)(1), North Dakota Rules of Civil Procedure, to dismiss the complaint, contending the state district court lacked subject matter jurisdiction. The court granted the motion dismissing the complaint and Airvator appealed.

There are four entities involved in the underlying factual situation from which the instant action arose. They are: (1) Airvator, (2) Turtle Mountain Manufacturing, (3) Turtle Mountain Investment Corporation (Turtle Mountain Investment), and (4) Turtle Mountain Band of Chippewa Indians.

Turtle Mountain Manufacturing is incorporated under the laws of North Dakota for the purpose of manufacturing motor vehicle trailers and engaging in other business ventures. Turtle Mountain Manufacturing is registered with the Secretary of State of North Dakota and has its office address at Belcourt, North Dakota, which is within the exterior boundaries of the Turtle Mountain Indian Reservation. Its registered agent is Wayne Keplin, Belcourt, North Dakota.

Fifty-one percent of the stock of Turtle Mountain Manufacturing is owned by Turtle Mountain Investment, a North Dakota corporation registered with the Secretary of State and formed for the purpose of manufacturing motor vehicle trailers and engaging in any other lawful business. Turtle Mountain Investment's registered office address is the Tribal Community Building, Belcourt, North Dakota, and its registered agent is also Wayne Keplin, of Belcourt, North Dakota. The remaining forty-nine percent of the stock of Turtle Mountain Manufacturing is owned by non-Indians.

Turtle Mountain Investment is wholly owned by the Turtle Mountain Band of Chippewa Indians, an unincorporated band of Chippewa Indians occupying the Turtle Mountain Indian Reservation located in the north central part of North Dakota. The Turtle Mountain Band of Chippewa Indians formed Turtle Mountain Investment to represent the tribe's interest in Turtle Mountain Manufacturing.

Turtle Mountain Manufacturing was formed with a loan and grant money obtained from the Bureau of Indian Affairs and the United States Department of Commerce Development Authority. The parties agreed during oral argument that, as a condition to qualify for the loan and grant money, the corporation had to be organized under the laws of the State of North Dakota and registered with the Secretary of State.

Airvator's counsel's affidavit in opposition to the motion to dismiss reflects that, to the best of his knowledge, two of the three original directors of Turtle Mountain Manufacturing (Harley Neshem and Donald Peterson) were not enrolled members of the Turtle Mountain Band of Chippewa Indians or of Indian descent. The affidavit further reflects that the affiant did not have any information, knowledge or belief concerning the descent of the third original director, Wayne Keplin. Turtle Mountain Manufac-

---

1. Airvator's notice of appeal stated that it appealed from the order of the trial court granting Turtle Mountain Manufacturing's motion for summary judgment and from the judgment entered pursuant to that order. An order for summary judgment is not appealable. *Gebeke v. Arthur Mercantile Co.,* 138 N.W.2d 796 (N.D. 1965); however, the judgment is appealable.

turing's counsel's affidavit in support of the motion to dismiss reflects that Turtle Mountain Manufacturing's board of trustees and directors is composed of seven members, four of whom were tribal members of the Turtle Mountain Band of Chippewa Indians and who exercised control over the company.

On 31 May 1980 Turtle Mountain Manufacturing, through its president, Donald Peterson, and its secretary, Harley Neshem, entered into a written manufacturing agreement with Airvator through its president, Keith Ballweg, whereby Turtle Mountain Manufacturing agreed to manufacture and assemble farm seeding equipment (Air-Seeders) for Airvator. Pursuant to statements in the affidavit of counsel for Airvator, the manufacturing agreement was primarily negotiated in Grand Forks and executed by Turtle Mountain Manufacturing's non-Indian officers at Berthold, and by Airvator at Langdon, all North Dakota locations which are not within the Turtle Mountain Indian Reservation. Turtle Mountain Manufacturing's counsel's affidavit in support of the motion to dismiss reflects that the "transaction . . . occurred wholly within the exterior boundaries of the Turtle Mountain Indian Reservation."

The manufacturing agreement did not state where the manufacturing was to take place; however, the machines were to be shipped f.o.b. Belcourt, North Dakota. Although the air seeders were shipped f.o.b. Belcourt, title did not pass from Turtle Mountain Manufacturing until it received payment. The agreement also provided that Turtle Mountain Manufacturing was obligated to repair, at its own expense and at the place of discovery, all breaches of warranty of workmanship and production.

Airvator's complaint alleged, in substance, that Turtle Mountain Manufacturing did not complete a written purchase order for 100 Air Seeders; that Turtle Mountain Manufacturing did not manufacture some of the air-seeders in a workmanlike manner nor were they prepared for delivery; that Turtle Mountain Manufacturing wrongfully refused to deliver completed air-seeders to Airvator; and that Turtle Mountain Manufacturing delivered air-seeders to persons not authorized by Airvator to receive them.

From the foregoing an issue of fact has been joined. However, the trial court's decision to dismiss the complaint was based on the grounds that it did not have subject matter jurisdiction because Turtle Mountain Manufacturing's majority stockholder was the Turtle Mountain Band of Chippewa Indians (Turtle Mountain Investment) and, further, that the major part of the contract was to be performed on the Turtle Mountain Indian Reservation.

The primary issue raised on appeal is whether or not the state court has subject matter jurisdiction over Airvator's cause of action against Turtle Mountain Manufacturing. A brief discussion of the history of Indian jurisdiction will help narrow the issue presented by this case.

Relations between the United States and Indian Nations have been historically viewed to be vested in the government of the United States. *Washington v. Confederated Bands and Tribes of the Yakima Indian Nation,* 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979), *rehearing denied,* 440 U.S. 940, 99 S.Ct. 1290, 59 L.Ed.2d 500 (1979); *McClanahan v. State Tax Commission of Arizona,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959); *Worcestor v. Georgia,* 31 U.S. 515, 6 Pet. 515, 8 L.Ed. 483 (1832).

In *Worcester v. Georgia,* 31 U.S. at 561, 6 Pet. at 561, 8 L.Ed. at 501, the United States Supreme Court stated:

"The Cherokee nation . . . is a distinct community, occupying its own territory . . . in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties, and with the acts of Congress. The whole intercourse between the United States and this nation, is, by our constitution and laws, vested in the government of the United States."

A major step toward the transfer of federal jurisdictional responsibility over Indian affairs to the States was the passage of Public Law 280[2] in 1953. It transferred criminal and civil jurisdiction over Indian lands from the federal to state governments in five states[3] and allowed for future assumptions of jurisdiction by the remaining states.

Public Law 280 extended to the remaining states the option of assuming jurisdiction on their own initiative at some future time. The statute divided these states into two categories. Section 6 of Public Law 280 permitted states whose constitutions or enabling acts contained provisions limiting the jurisdiction they could assert over Indians and Indian lands to amend their constitutions or enabling acts, thereby removing any legal impediment to the assumption of jurisdiction.[4] Section 7 of Public Law 280

permitted states not included in the mandatory transfer and not prevented from assuming jurisdiction by their constitutions or enabling acts to assume jurisdiction "at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof."[5] In 1968 Congress passed Public Law 90–284 requiring Indian consent to subsequent transfers of jurisdiction.[6]

The Congressional Enabling Act passed 22 February 1889 provided for the establishment of the states of Montana, North Dakota, South Dakota, and Washington. Section 4, subdivision 2, of that Act provided that "Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States." That section was incorporated into the original North Dakota

**2.** Act of August 15, 1953, Ch. 505, 67 Stat. 588 (codified as amended at 18 U.S.C. § 1162, 25 U.S.C. §§ 1321–1326, 28 U.S.C. §§ 1360, 1360 note).

**3.** Public Law 280 provided for the mandatory transfer of criminal and civil jurisdiction to the following states: California, Minnesota (except for the Red Lake Reservation), Nebraska, Oregon (except for the Warm Springs Reservation), and Wisconsin (except for the Menominee Reservation). Pursuant to the Act of August 24, 1954, Ch. 910, § 2, 68 Stat. 795, 796, state jurisdiction was extended to the Menominee Reservation. In 1958, Alaska was granted jurisdiction over Indian lands within its boundaries, and in 1970 this jurisdictional grant was amended to provide for concurrent tribal and state criminal jurisdiction over the Metlakatla Indian community. See Act of August 8, 1958, Pub.L. No. 85–615, § 1, 72 Stat. 545, as amended by Act of November 25, 1970, Pub.L. No. 91-523, § 1, 84 Stat. 1358.

**4.** Public Law 280, § 6, provides as follows:
Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act: *Provided,* That the provisions of this Act shall not become effective with respect to such assumption of jurisdiction by any such State until the people thereof have appropriately amended their State constitution or statutes as the case may be."

**5.** Public Law 280, § 7, provides as follows:
"The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both, as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof."

**6.** Act of April 11, 1968, Pub.L. No. 90–284, § 402, 82 Stat. 79. (codified at 25 U.S.C. § 1322). 25 U.S.C. § 1322, provides, in part, as follows:
"(a) Consent of United States—Force and effect of civil laws. The consent of the United States is hereby given to any State not having jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country situated within such State to assume, with the consent of the tribe occupying the particular Indian country or part thereof which would be affected by such assumption, such measure of jurisdiction over any or all of such civil causes of action arising within such Indian country or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State."

Constitution as a "Compact with the United States." Article XVI, § 203, N.D. Const. (1889).

Pursuant to the option given to North Dakota by the United States in Public Law 280, the people of North Dakota, in 1958, approved an amendment to § 203 of the North Dakota Constitution which provides, in part, as follows:

"The people inhabiting this state do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes, and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and that said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States, *provided, however, that the legislative assembly of the state of North Dakota may, upon such terms and conditions as it shall adopt, provide for the acceptance of such jurisdiction as may be delegated to the state by Act of Congress . . . .*" Article XIII, § 1, N.D. Const. [Emphasis added.]

In 1963 the North Dakota Legislature, pursuant to the authority given in Public Law 280 and the constitutional amendment to § 203, enacted Ch. 27–19, North Dakota Century Code. That chapter permits state courts to take jurisdiction over "all civil causes of action which arise on an Indian Reservation upon acceptance [of such jurisdiction] by Indian citizens . . . ." NDCC § 27–19–01 [7]. The method of acceptance is set forth in NDCC § 27–19–02, which provides as follows:

"Acceptance of jurisdiction may be by either of the following methods:

1. Upon petition of a majority of the enrolled residents of a reservation who are eighteen years of age or older; or

2. The affirmative vote of the majority of the enrolled residents voting who are eighteen years of age or older, at an election called and supervised by the North Dakota Indian affairs commission upon petition of fifteen percent of those eligible to vote at such an election." [8]

As a result, this Court has consistently held that state courts have no jurisdiction over civil causes of action involving Indians, arising within the exterior boundaries of an Indian Reservation, unless a majority of the enrolled residents of the Reservation vote to accept jurisdiction. *Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering, P.C.,* 321 N.W.2d 510 (N.D.1982); *United States ex rel. Hall v. Hansen,* 303 N.W.2d 349 (N.D.1981); *Malaterre v. Malaterre,* 293 N.W.2d 139 (N.D. 1980); *Nelson v. Dubois,* 232 N.W.2d 54 (N.D.1975); *In re Whiteshield,* 124 N.W.2d 694 (N.D.1963).

The Turtle Mountain Band of Chippewa Indians have not accepted State jurisdiction pursuant to North Dakota Century Code Ch. 27–19.

With these rules of law in mind, the narrower issue presented by this case is whether or not a state chartered corporation with fifty-one percent Indian stock-

---

**7.** NDCC § 27–19–01 provides as follows:

"In accordance with the provisions of Public Law 280 of the 83rd Congress and section 203 of the North Dakota constitution, jurisdiction of the state of North Dakota shall be extended over all civil causes of action which arise on an Indian reservation upon acceptance by Indian citizens in a manner provided by this chapter. Upon acceptance the jurisdiction of the state shall be to the same extent that the state has jurisdiction over other civil causes of action, and those civil laws of this state that are of general applica-

tion to private property shall have the same force and effect within such Indian reservation or Indian country as they have elsewhere within this state."

**8.** In *Malaterre v. Malaterre,* 293 N.W.2d 139 (N.D.1980), we said that some of the provisions of NDCC ch. 27–19 such as § 27–19–05 relating to individual acceptance of jurisdiction as possibly § 27–19–06 relating to acceptance of jurisdiction by a guardian were no longer effective because or Public Law 90–284. (See footnote 6.)

holders is an "Indian" for jurisdictional purposes.[9]

We recognize that the term "Indian" may be used in an ethnological or a legal sense. See F. Cohen, Handbook of Federal Indian Law (1982 ed.), p. 19. The issue raised in the instant appeal, out of necessity, requires us to look at the term "Indian" in the legal sense, as well as in conjunction with the principles of law relating to corporations.

Our research has revealed no federal definition, statutory or otherwise, of "Indian corporation" for jurisdictional purposes,[10] and none has been called to our attention. Our research has revealed only a limited number of cases dealing with the definition of an "Indian corporation" for purposes of jurisdictional analysis.

The recent case of *Donovan v. Navajo Forest Products Industries,* 692 F.2d 709 (10th Cir.1982), holding that the Occupational Safety and Health Act (OSHA) did not apply to or govern the working conditions of a corporation operated by Indians within the Reservation, is not pertinent. Its rationale is limited to the concept that Congress did not intend to abrogate the treaties entered into between the United States and the Navajo Indians.

In *Eastern Navajo Industries, Inc. v. Bureau of Revenue,* 89 N.M. 369, 552 P.2d 805 (Ct.App.1976), *cert. denied* 90 N.M. 7, 558 P.2d 619 (N.M.1976), *cert. denied,* 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 810 (1977), a corporate taxpayer, Eastern Navajo Industries, appealed from an order assessing gross receipts received by it for building houses on part of the Navajo Reservation for the Navajo Housing Authority, an entity created and organized under ordinances of the Navajo Indian Tribe. Fifty-one percent of the stock of Eastern Navajo Industries was owned by individual Navajo Indians and forty-nine percent of its stock was owned by two individuals who were not Navajo Indians. Eastern Navajo Industries was incorporated pursuant to the state laws of New Mexico. The record reflected that Eastern Navajo Industries was formed at the instigation and under the auspices of the Navajo Tribal council and that shareholders bought stock in the company with loans from the federal government under a

**9.** Airvator also asserted that "North Dakota Courts have jurisdiction over disputes between Indians and non-Indians provided such disputes do not interfere with tribal self-government or internal affairs." This assertion was based on the concept of "residuary jurisdiction" which we rejected in *Nelson v. Dubois,* 232 N.W.2d 54 (N.D.1975). We recently adhered to that decision in *Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Engineering, P.C.,* 321 N.W.2d 510 (N.D.1982).

**10.** We are aware that provisions of the Indian Reorganization Act, 25 U.S.C. §§ 476, 477, provide for the creation of two separate tribal entities. The entity created by § 476 allowed the protection of sovereign immunity traditionally afforded Indian tribes, and the entity created by § 477 has the ability to waive the protection of sovereign immunity. See, *Parker Drilling Co. v. Metlakatla Indian Community,* 451 F.Supp. 1127 (D.C.Alaska 1978). In this instance the record does not reflect whether or not the tribal entity is organized pursuant to either of these sections. However, the Turtle Mountain Band of Chippewa Indians is not a named party to the instant lawsuit. See, *Namekagon Development Co., Inc. v. Bois Forte Reservation Housing Authority,* 395 F.Supp. 23 (D.C.Minn.1974), *aff'md,* 517 F.2d 508 (8th Cir. 1975).

We are also aware that certain provisions in the Code of Federal Regulations deal with corporations and their percent of Indian ownership for limited purposes, such as procedures under which non-reimbursable grants may be made to eligible applicants to stimulate and increase Indian entrepreneurship. See, 25 CFR, Chapter I, subchapter N—Economic Enterprises, Part 286. Section 286.3 of subchapter N provides, in pertinent part, that eligible applicants are "Associations, corporations or partnerships shall be at least fifty-one percent owned by eligible Indians or an eligible Indian tribe.... The legal organization documents shall provide safeguards which will prevent Indian ownership and control from decreasing below fifty-one percent." However, this provision relates to the procurement of grants to increase Indian entrepreneurship and is essentially designed to insure that Indians or Indian groups receive the grants.

Additionally, we note that other parts of the Code of Federal Regulations define an Indian corporation for certain purposes. 25 CFR, Chapt. I, Part 273.2(h) [Education Contracts Under Johnson-O'Malley Act].

However, these definitions do not deal with Indian corporations for civil purposes.

program designed to facilitate Indian self-help. The record further reflected that funds used by the Navajo Housing Authority to form the corporation were obtained from the Indian Business Development Fund. The provisions of the Indian Business Development Fund required that a project must be owned or controlled by individual Indians or an Indian group to be eligible for grants. Indian group was defined in 25 C.F.R., § 80.12 (1971), as follows:

> "80.12 Indian groups. Any group of eligible individual Indians which may legally engage in private enterprise may apply for a grant. This includes Indian corporations organized under Federal or State law and, if authorized to enter contracts on behalf of an Indian tribe, those organizations commonly known as 'Tribal Enterprises,' which are economic enterprises. However, for Indian corporations, fifty-one percent [51%] or more of the stock must be owned by eligible Indians or by an Indian tribe."

The New Mexico court of appeals annulled the assessment because 25 C.F.R., § 80.12, explicitly required consideration of the ethnicity of the stockholders of corporations in considering the eligibility for grants to establish a profit-making Indian economic enterprise employing Indians. The New Mexico court went on to hold that, according to the federal definition, the corporation was an Indian so that the imposition of the gross receipts tax on the corporation constituted an interference with Indian self-government.

The holding in *Eastern Navajo Industries, Inc., supra,* is questioned by a recognized authority on Indian Law, F. Cohen, Handbook on Federal Indian Law (1982 ed.) at pages 355–56, dealing with the status of corporations for purposes of determining if state or tribal jurisdiction applies:

> "For purposes of jurisdictional analysis, because state court jurisdiction is predicated on non-Indian status or noninter-

ference with tribal self-government, tribal governments, their agencies, authorities and arms, IRA [Indian Reorganization Act] corporations, and tribally chartered corporations with majority ownership either in the tribe or in private Indians' hands, should all be treated the same as Indians and under tribal authority to the same extent.[72] *State chartered corporations, being fictional persons created by the states, should be treated as non-Indians even if owned by Indians.*[73] State court jurisdiction over tribally chartered corporations owned by non-Indians should depend on whether tribal government is involved sufficiently in their activities so as to preclude state jurisdiction." [Emphasis added.]

---

"[72] *Central Machinery Co. v. Arizona State Tax Comm'n,* [448 U.S. 160], 100 S.Ct. 2592, 2595 n. 3 [65 L.Ed.2d 684] (1980) (tribal enterprise); *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 157 n. 13 [93 S.Ct. 1267, 1275 n. 13, 36 L.Ed.2d 114] (1973) (IRA corporation).

"[73] The one reported case on this point is to the contrary and seems wrong in its rationale. *Eastern Navajo Indus., Inc. v. Bureau of Revenue,* 89 N.M. 369, 552 P.2d 805 (Ct.App.) *cert. denied,* 90 N.M. 7, 558 P.2d 619 (1976), *cert. denied,* 430 U.S. 959 [97 S.Ct. 1610, 51 L.Ed.2d 810] (1977). The result may be correct for other reasons. *See* Ch. 7, Sec. E *infra.*" [11]

We agree with the statements in Cohen that, for purposes of jurisdictional analysis, state-chartered corporations should be treated as non-Indians independent of their percentage of Indian shareholders. Furthermore, nothing in the record before us reflects that Turtle Mountain Manufacturing is a tribally chartered corporation.

■ A corporation is not in fact or in reality a person, but is created by statute and the law treats it as though it were a person by the process of fiction, or by regarding it as an artificial person distinct and separate from its individual stockholders. *Moline Properties, Inc. v. Comm'r of Internal Revenue,* 319 U.S. 436, 63 S.Ct. 1132, 87 L.Ed. 1499 (1943); *Boise Cascade Corp. v. Wheeler,* 419 F.Supp. 98 (S.D.N.Y.

---

11. Cohen, *supra* at 438, fn. 6, states that the receipts may have been nontaxable, whether the builder was Indian or not, based on *Warren*

*Trading Post Co. v. Arizona Tax Commission,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965).

1976), *aff'd* 556 F.2d 554 (2d Cir.1977); *Monterey Life Systems, Inc. v. United States,* 635 F.2d 821 (Ct.Cl.1980).

A corporation cannot exist without the consent or grant of the sovereign and the power to create a corporation is one of the attributes of sovereignty. *Asbury Hospital v. Cass County,* 72 N.D. 359, 7 N.W.2d 438 (1943). The state has plenary power and authority over corporations. *Phillips-Van Heusen Corp. v. Shark Brothers, Inc.,* 289 N.W.2d 216 (N.D.1980). A corporate charter is not only the articles of incorporation, but includes all statutes which confer, define, or limit a corporation's powers. *Nelson v. Dakota Bankers Trust Co.,* 132 N.W.2d 903 (N.D.1964).

The characteristics of a corporation generally include the capacity of perpetual existence; the power to sue or be sued in the corporate name; the ability to acquire and transfer property and do other acts in the corporate name; the ability to purchase and hold real estate; the power to actually engage in a specified business as set forth in its articles of incorporation; and such other characteristics and powers as may be provided by statute. See, 1 Fletcher Cyclopedia Corporation (Perm. Ed.), ch. 1, § 5. In essence, a corporation is recognized and permitted to do business subject to the terms the Legislature may impose.

The statutory provisions contemplate that certain procedures be followed before a corporation comes into existence. See generally NDCC Ch. 10–19.

The general powers of a North Dakota corporation are outlined in NDCC § 10–19–04. Pursuant to that section, each corporation has the power to sue and be sued, complain, and defend in its corporate name. NDCC § 10–19–04(2); *Phillips-Van Heusen Corp. v. Shark Brothers, Inc., supra.* Additionally, a corporation has the power to have perpetual existence and to elect or appoint officers and agents of the corporation. NDCC § 10–19–04(1) and (11).

A shareholder of a corporation is under no obligation to the corporation or its creditors other than to pay the corporation full consideration for shares. NDCC § 10–19–22.

The ultimate control of a corporation is in its shareholders and they elect a board of directors to manage the corporation. NDCC §§ 10–19–36, 10–19–37. The board of directors, in turn, selects the officers of the corporation. NDCC § 10–19–49. The directors, officers and agents of a corporation are generally not personally liable for their actions unless those actions are done without the requisite authority. See NDCC §§ 10–19–23, 10–19–47.

These principles, in part, establish and reaffirm the concept that, although a corporation can exist indefinitely and perpetually, its shareholders, directors, officers and agents do not necessarily share that immortality; and further, a corporation is an artificial being, invisible, intangible, and existing only in contemplation of law.[12] Moreover, these statutes and authorities lend support to the principle that a corporation is an entity distinct and separate from its shareholders, directors, officers, and agents.

**12.** Chief Justice Marshall gave the following famous definition of a corporation in *The Trustees of Dartmouth College v. Woodward,* 17 U.S. 518, 636, 4 Wheat. 518, 636, 4 L.Ed. 629, 659 (1819):

"A corporation is an artificial being, invisible, intangible, and existing only in contemplation of law. Being the mere creature of law, it possesses only those properties which the charter of its creation confers upon it, either expressly or as incidental to its very existence. These are such as are supposed best calculated to effect the object for which it was created. Among the most important are immortality, and, if the expression may be allowed, individuality; properties by which a perpetual succession of many persons are considered as the same, and may act as a single individual. They enable a corporation to manage its own affairs, and to hold property without the perplexing intricacies, the hazardous and endless necessity, or perpetual conveyances for the purpose of transmitting it from hand to hand. It is chiefly for the purpose of clothing bodies of men, in succession, with these qualities and capacities, that corporations were invented, and are in use. By these means, a perpetual succession of individuals are capable of acting for the promotion of the particular object, like one immortal being."

Because a corporation is a fictional person, it must rely upon its officers, directors, and agents to perform the tasks which the corporate law permits. Among these provisions which authorize actions on behalf of the corporation are provisions relating to the designation of an agent for service of process, NDCC § 10–19–09, and service of process on the corporation, NDCC § 10–19–11. Significantly, NDCC § 10–19–11 provides that the Secretary of State may, in some instances, be the agent of a corporation for service of process.

Additionally, our Rules of Civil Procedure provide that "A court of this state may exercise personal jurisdiction over a person [which by definition includes a corporation] ... organized under the laws of ... this state." NDRCivP 4(b)(1). Pursuant to NDRCivP 4(d)(2)(D), service of process within the state is made:

"upon a domestic or foreign corporation or upon a partnership or other unincorporated association, by delivering a copy of the summons to an officer, director, superintendent or managing or general agent, or partner, or associate, or to an agent authorized by appointment or by law to receive service of process in its behalf, or to one who acted as an agent for the defendant with respect to the matter upon which the claim of the plaintiff is based and who was an agent of the defendant at the time of service. If the sheriff makes a return that no person upon whom service may be made can be found in the county, then service may be made by leaving a copy of the summons at any office of the domestic or foreign corporation, partnership or unincorporated association within this state with the person in charge of the office."

Although these statutes and rules recognize that officers, directors or agents may carry out authorized acts for a corporation, they do not destroy the distinct entity concept which is a necessary part of corporation law.

■■■ Because it is a distinct entity, a corporation, for purposes of jurisdiction, is a citizen of and is subject to the jurisdiction of the courts of the state in which it is incorporated. 9 Fletcher Cyclopedia Corporations (Perm Ed.), ch. 51, § 4309. For purposes of jurisdiction, the citizenship of the shareholders, directors, officers and agents has little influence with regard to the citizenship of a corporation. 18 Am. Jur.2d, *Corporation,* § 159. Neither do we believe the status of the stockholders, directors, officers, or agents, as Indians or non-Indians have, in this instance, any influence with regard to the status of the state-incorporated corporation as an "Indian" or "non-Indian." To give credence to the status of individual shareholders would overlook the general theory of corporations relative to their status as a distinct entity. Moreover, such credence would promote an unmanageable and undesirable method of determining jurisdiction because the possibility of a change in the percentage of Indian shareholders.

We also recognize that the parties agreed during oral argument that, as a condition to qualify for federal loan and grant money, the corporation had to be organized under the laws of the state of North Dakota and registered with the Secretary of State. We must assume the federal government was aware that any corporation formed and created, which is registered with the Secretary of State and exists in accordance with and pursuant to state law, is subject to the jurisdiction of that state.

The piercing of the corporate veil is not involved, either directly or indirectly, nor have any facts been presented making such issue obvious; therefore, those legal concepts have no application in this case.

We do not believe that North Dakota justifiably may or should overlook or disregard its laws pertaining to corporations and its jurisdiction over corporations formed and existing under its laws.

■■■ We conclude, based on principles of law relating to corporations and jurisdiction of "Indians" and "non-Indians" that, in this instance, the state courts of North Dakota have jurisdiction over Turtle Mountain Manufacturing, a North Dakota chartered corporation.

We do recognize that, in the event a judgment is secured in favor of Airvator against Turtle Mountain Manufacturing, enforcement and execution of that judgment in state court may be difficult because the corporation's assets may be located on the Turtle Mountain Indian Reservation. We note that the Turtle Mountain Tribal Code of 1976, § 4.0102, contains the following full faith and credit provision:

"Full faith and credit. Full faith and credit will be given to public acts, records and judicial proceedings of all other reservations and all Federal and State jurisdictions that have enacted a full faith and credit provision in their constitution or statutes."

North Dakota Century Code Ch. 28–20.1 relates to enforcement of foreign judgments. Section 28–20.1–01, NDCC, defines a foreign judgment as a "judgment ... of a court of the United States or of any other court which is entitled to full faith and credit in this state." Consequently, we express the caveat that the execution of any judgment obtained against Turtle Mountain Manufacturing through, or as a result of, any state proceedings, in all probability would be governed [13] by the provisions of the Turtle Mountain Code of 1976. Any construction or interpretation of the Tribal Code by this Court or a state court would not be binding, but would be only advisory, at the most. It is not an issue, nor was it argued; therefore, we deem it inadvisable to further comment on this particular subject.

The judgment of the district court dismissing Airvator's complaint is reversed and the case is remanded for proceedings consistent with this opinion.

ERICKSTAD, C.J., and VANDE WALLE, PEDERSON and PAULSON, JJ., concur.

---

**13.** Our observation regarding the execution of a judgment is primarily concerned with property or subject matter physically located within the Turtle Mountain Indian Reservation.